833 So.2d 857 (2002)
FLEETWOOD HOMES OF FLORIDA, INC., Marvin Miller, and Mickie Oliver, Appellants,
v.
Allison Gae REEVES, as Personal Representative of the Estate of Dennis Mitchell Reeves, deceased, Appellee.
No. 2D01-5308.
District Court of Appeal of Florida, Second District.
December 27, 2002.
*859 John W. Frost, II, and Peter W. Van den Boom of Frost Tamayo Sessums & Aranda, P.A., Bartow, for Appellants.
Robin Gibson and Kevin A. Ashley of Gibson, Valenti & Ashley, Lake Wales; and John Hugh Shannon of John Hugh Shannon, P.A., Lakeland, for Appellee.
ALTENBERND, Judge.
Fleetwood Homes of Florida (Fleetwood) and its employees, Marvin Miller and Mickie Oliver, appeal a nonfinal order that denies, as a matter of law, their motions for summary judgment on the issue of workers' compensation immunity. Fleetwood and its employees requested this ruling in a wrongful death action filed by Allison Gae Reeves, as the personal representative of the Estate of Dennis Mitchell Reeves. We conclude that we have jurisdiction to review this order and further conclude that Fleetwood and its employees are entitled to a summary judgment on the issue of workers' compensation immunity. Accordingly, we reverse the trial court's order. Because we are uncertain whether our exercise of jurisdiction and our resolution of these important immunity issues are faithful to the holdings in Hastings v. Demming, 694 So.2d 718 (Fla.1997), and Turner v. PCR, Inc., 754 So.2d 683, 686 (Fla.2000), we certify two questions of great public importance to the Supreme Court of Florida.

I. THE ACCIDENT
Dennis Reeves was an employee of Fleetwood, which manufactures homes in a factory. Although he normally had another job assignment, on April 1, 1991, he was assigned to work at a table inside the *860 factory. The table was adjacent to an aisle used by the forklift operators to move supplies into the factory. A structural column that supported the roof of the factory was across the aisle from this table. A pipe ran up the aisle side of this column. Because of the layout of the factory near this column, for a distance of about 25 feet, the aisle was narrower at ground level than the width of some of the supplies that were transported by the forklifts. As a result, the forklift operators had been instructed to raise wide loads to approximately 14 feet in the air.
A common wide load that was transported by the forklifts was sheet metal used as roofing material for the manufactured homes. This sheet metal came in rolls that weighed about 600 pounds and were about 12-feet wide. The forklifts transported three rolls per trip. The roofing material was not strapped onto the forklifts. When the roofing material was raised 14 feet in the air, the forklift operators did not have a clear view of the column and had only a few inches of clearance. They relied upon a painted stripe on the floor to properly position their forklifts to negotiate this narrow location.
When a forklift entered the factory, the operator honked its horn. This was a signal for nearby workers to move out of the way. Affected workers were instructed to heed the warning provided by the horn, but workers did not always respond to the horn. The management at Fleetwood had instructed the forklift operators to continue transporting their loads even if another worker did not move. They were expected to report such a problem to management at a later time. Because Mr. Reeves had never worked at this table prior to the day of the accident, it is unclear whether he had been instructed to heed the horn.
On the day of this accident, Marvin Miller was the forklift operator. He sounded the forklift's horn as he entered this area with rolls of sheet metal. He did not know Mr. Reeves. He observed that Mr. Reeves was not leaving the table. He continued to transport the roofing material. As he was negotiating the narrow location by the column and the pipe, he was watching the painted marking on the floor for proper positioning. For some reason, the roofing material hit the pipe. The load was knocked off balance and a roll of the sheet metal slid off the driver's left side of the forklift, striking Mr. Reeves. He sustained severe injuries and died shortly after this accident.
The management at Fleetwood knew that forklift operators had occasionally bumped this pipe when transporting wide loads. Mr. Miller's foreman, Mickie Oliver, also knew that forklift operators had struck this pipe. There is no evidence, however, that a roll of roofing or any other wide load had ever previously fallen from a forklift or that any worker had ever been injured as a result of this procedure. Mr. Miller was a very experienced forklift operator. He had performed this maneuver on many occasions in the past. There is no evidence that he had any prior history of accidents, that he was driving too fast or recklessly at the time of this accident, or that he was under the influence of any unlawful substance. He simply misjudged the location of the pipe or the position of his load, and the accident happened.
OSHA investigated this accident. It declined to treat the accident as a willful violation of safety regulations. OSHA fined Fleetwood $7000 and ordered certain corrective action. Fleetwood is still allowed to raise wide loads into the air, but it now secures these elevated loads. It requires the forklift operators to clear employees from this area before transporting such loads. Fleetwood is taking greater steps to make certain that all employees *861 are aware of this danger. Although it apparently was not required by OSHA, Fleetwood has moved the table away from the location of this accident.

II. THE LAWSUIT
Allison Reeves, as Mr. Reeves' personal representative, filed this wrongful death action in 1993. The parties engaged in extensive discovery. Thus, although this is an appeal from a nonfinal order, our record contains detailed evidence about the circumstances surrounding this accident.
The second amended complaint contained six counts and described the factual allegations in considerable detail. The first count contained allegations against Old Republic Insurance Company that are not relevant to this appeal. The second and third counts attempted to allege simple negligence against Mr. Miller, Mr. Oliver, and Fleetwood. All three of these counts have been dismissed and are not at issue in this appeal.
The fourth count attempted to allege gross negligence as to the conduct of Mr. Miller. It alleged that (1) he knew, prior to this accident, that other workers had not been getting out of his way when he drove the elevated loads; (2) he knew Mr. Reeves did not respond to his warning and remained in an area of danger at the time of this accident; (3) he knew he had poor visibility and a small margin of error in which to maneuver this elevated load; (4) he knew the load was not secured; and (5) he knew these procedures were dangerous and a violation of safety policies. This count included an allegation that Mr. Miller had engaged in a course of conduct that a reasonably prudent person would know was probably and most likely to result in injury to persons.
The fifth count attempted to allege gross negligence against the foreman, Mr. Oliver. It realleged the risks described in the count against Mr. Miller and explained that Mr. Oliver was an experienced forklift operator who worked essentially as a foreman with the responsibility to supervise Mr. Miller's work and to assure that it was performed safely. The complaint concluded that he too should have known that these circumstances were probably and most likely to result in injury to persons.
The sixth count attempted to allege an unspecified intentional tort against Fleetwood. It realleged the conduct of Mr. Miller and Mr. Oliver. It alleged that management at Fleetwood had knowledge of these circumstances. It alleged that Fleetwood pressured its workers to maintain a high degree of productivity and did not provide adequate safety training or properly respond to the known safety issues created by the forklifts. It concluded that the "course of conduct" of the Fleetwood employees was such that a reasonably prudent person would know that it was "substantially certain to result in injury or death."[1]
After this action had been pending for several years, Fleetwood and its employees moved for summary judgment. The parties apparently have never disputed that Mr. Reeves was an employee and that Fleetwood was a statutory employer who had provided workers' compensation benefits. Thus, the dispositive issue for purposes of summary judgment was whether workers' compensation benefits were the exclusive remedy in this case under section 440.11, Florida Statutes (Supp.1990), or, alternatively stated, whether Fleetwood *862 and its employees could be sued in tort despite the availability of the statutory remedy.
The trial court conducted a lengthy hearing on this motion, which was transcribed. The trial court indicated at the hearing that it expected the issues would be appealed to this court. It carefully prepared an order denying summary judgment concerning the gross negligence claims against Mr. Miller and Mr. Oliver. In its order, the court expressly noted that the maneuver that resulted in this accident had been accomplished thousands of times by Mr. Miller and other forklift operators in the ten years preceding this accident "with no displacement of materials being carried on the forklifts." The court also noted that Mr. Miller performed this maneuver at the time of the accident consistent with the manner in which he had performed it on hundreds of previous occasions, but that, on this occasion, one of the rolls of metal became dislodged and struck Mr. Reeves. The trial court concluded that
the acts complained of in the instant case were not as egregious as those present in [case law] in which recovery was allowed. Nevertheless, the Court finds that the occurrence of the subject incident was inevitable, given the violations alleged by plaintiff (which are disputed by defendant but, which must be accepted as true on a Motion for Summary Judgment).
Accordingly, the trial court ruled: "As to these Counts, as a matter of law, the defendant's Motion should be DENIED."
As to the count alleging an intentional tort against Fleetwood, the trial court concluded that Mr. Oliver's knowledge of these dangers was chargeable to Fleetwood. It repeated the above-quoted conclusion that, although the acts are not as egregious as those in other case law, this accident was "inevitable" in light of the ongoing safety violations associated with this maneuver. The trial court denied the motion for summary judgment on this count stating:
The Court finds that Oliver committed intentional acts ... or [acts] that were substantially certain to result in injury or death to [Reeves.] See Eller v. Shova, 630 So.2d 537, 539 (Fla.1993).
Fleetwood, Mr. Oliver, and Mr. Miller have timely appealed this nonfinal order.

III. JURISDICTION
This court has struggled with the question of whether it has jurisdiction in this case. Appellate jurisdiction over interlocutory orders in Florida is established by rules adopted by the supreme court. See art. V, § 4(b)(1), Fla. Const. Those rules limit the type of nonfinal orders that district courts can review. See Fla. R.App. P. 9.130. Moreover, by virtue of the nature of such nonfinal appeals, the district court's scope of review is restricted to the specific issue resolved in the interlocutory order. Rule 9.130(a)(3)(C)(v) grants a district court jurisdiction to review a nonfinal order that "determines that, as a matter of law, a party is not entitled to workers' compensation immunity." The phrase "as a matter of law" was relocated within this rule in 1996.[2] The committee notes to the rule explain that the change was made to clarify that this rule "was not intended to grant a right of nonfinal review if the lower tribunal denies a motion for summary judgment based on the existence of a material fact dispute." *863 Fla. R.App. P. 9.130(a)(3)(C)(v) committee notes (1996 amend.).
In Hastings v. Demming, 694 So.2d 718 (Fla.1997), the supreme court stated:
We changed the phrasing of the subject rule in order to settle the inconsistency between the district courts. Nonfinal orders denying summary judgment on a claim of workers' compensation immunity are not appealable unless the trial court order specifically states that, as a matter of law, such a defense is not available to a party. In those limited cases, the party is precluded from having a jury decide whether a plaintiff's remedy is limited to workers' compensation benefits and, therefore, an appeal is proper. Otherwise, the denial of the summary judgment may be based on a factual dispute and the party is still likely able to present an immunity defense to the jury. In those cases, the new rule makes clear that the district courts have no jurisdiction to hear an appeal of the nonfinal order.
Id. at 720.
Each party argues persuasively that this court either does or does not have jurisdiction. The appellants argue that the trial court obeyed Hastings and has specifically stated that the defense of workers' compensation immunity is not available "as a matter of law." As a result, Fleetwood and its employees will not be entitled to present an "immunity defense to the jury" if this case proceeds to trial. Ms. Reeves responds that the trial court clearly found unresolved questions of fact, thus leaving issues for a jury to decide.
Our jurisdictional dilemma is predicated on the fact that workers' compensation immunity is not usually a defense at trial. This immunity is somewhat different from the affirmative defense of qualified immunity in a civil rights case, which is given comparable nonfinal appeal status. See Fla. R.App. P. 9.130(3)(c)(vii); Montague v. Cooley, 735 So.2d 511, 512 (Fla. 2d DCA 1999) (reversing denial of summary judgment on nonfinal appeal); see also Stephens v. Geoghegan, 702 So.2d 517 (Fla. 2d DCA 1997) (discussing nonfinal jurisdiction but using certiorari to grant relief); Vermette v. Ludwig, 707 So.2d 742, 744 (Fla. 2d DCA 1997) (same); Bd. of Regents v. Snyder, 826 So.2d 382 (Fla. 2d DCA 2002) (same).
In a civil rights case, qualified immunity is a separate and distinct question from the plaintiff's theory of liability. See, e.g., Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). While a plaintiff in such a case seeks to prove a violation of his or her civil rights, the defendant argues that even if the act is a violation, the act was done "in good faith." See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, a defendant must prove this affirmative defense, and the jury usually makes a separate finding on the verdict addressing this defense when it is a factual issue submitted to the jury.
In a workers' compensation immunity case, the employer and fellow employees are generally entitled to invoke the exclusiveness of workers' compensation liability under section 440.11 so long as the employer has provided the benefits required under section 440.10, Florida Statutes (Supp.1990). Rarely does a lawsuit involve a dispute over whether a defendant was the employer or whether the benefits under section 440.10 were provided. Instead, a plaintiff seeking damages in tort admits the fact that the benefits are available and then attempts to plead and prove the type of claim that avoids the exclusive liability restrictions of section 440.11.
It is important to understand the legal framework involved in such a lawsuit. *864 In general, an employee may sue an employer for injuries arising from an intentional tort even if the employer provides workers' compensation benefits. See Turner, 754 So.2d at 686. An employee may also sue a managerial employee or supervisor, if that person's conduct rises to the level of culpable negligence, or a fellow worker, if that coworker's conduct rises to the level of gross negligence or willful and wanton conduct. See § 440.11, Fla. Stat. (Supp.1990); Eller, 630 So.2d at 539. In such a lawsuit, if the plaintiff can prove the heightened level of misconduct, which is well above simple negligence, the defendant has no "defense" of workers' compensation immunity. The defendant does not present evidence on some affirmative defense of immunity. The defendant simply argues that, under the particular standard of care, the jury should not impose liability on the defendant.[3]
As a result of this legal framework, if a trial court decides to deny an employer's or a fellow employee's motion for summary judgment, the court will rarely state that it is deciding an issue "as a matter of law." Instead, the trial judge will usually conclude that a disputed issue of fact exists as to whether the employer or the fellow employee was liable under the applicable lower standard of care. For example, the truth may be that the trial court in this case actually decided that Fleetwood and its employees were entitled to workers' compensation immunity, but that immunity did not prevent this suit from going to trial on allegations of gross negligence or intentional tort. If the supreme court intends to prohibit appellate review of orders denying summary judgment in all cases where the trial court intends to allow the plaintiff to proceed to trial on an intentional tort or a claim of gross negligence or culpable negligence, then it might be simpler to eliminate rule 9.130(a)(3)(C)(v) because the rule would then have virtually no application to any order that a defendant would wish to appeal.[4]
The history of the workers' compensation system demonstrates that the legislature intended to give coworkers and employers immunity from suit except in extraordinary situations. Such immunity not only limits the expense of doing business in Florida over and above the admittedly significant expenses of the workers' compensation no-fault system, but also helps maintain a better work environment in which coworkers are not constantly in fear of being sued by their fellow employees. The legislature has thus created an exclusive, administrative, no-fault remedy that is unaffected by comparative negligence in exchange for broad immunity from lawsuits for employers and coworkers. The goal of this policy is to avoid lawsuits at the outset, not simply to prevent adverse verdicts against employers and coworkers at the end of lengthy litigation. If the trial courts are to foster these legislative policies, they must serve as gatekeepers at the initial *865 stages of litigation. If the appellate courts are to monitor compliance with these legislative policies, the review must take place at the time the nonfinal order is entered, and not after lengthy and expensive litigation. Cf. Tucker v. Resha, 648 So.2d 1187, 1189 (Fla.1994) (nonfinal appeal necessary to achieve immunity from suit).
We are convinced the supreme court understands these policy distinctions and intends for the district courts to have jurisdiction to review cases similar to this case. In this case, there are undoubtedly factual questions in dispute. However, because the standards of care applicable to gross negligence, culpable negligence, and intentional tort are very limited, the disputed facts in this case do not actually create disputes concerning the material issues. In other words, the facts in the light most favorable to the plaintiff are so "crystallized" that a court can determine, as a matter of law, that these facts do not rise to the heights of gross negligence, culpable negligence, or intentional tort. See Hastings, 694 So.2d at 719. Thus, rule 9.130(a)(3)(C)(v) should restrict us from examining cases where the record is not factually well-developed on the issue of workers' compensation immunity, but it should not prevent us from enforcing the legislative policy of immunity when we can review a well-developed record to conclude that the plaintiff cannot present prima facie evidence to establish the exceptional case of gross negligence, culpable negligence, or intentional tort in this context.
The trial court in this case expressly included within its order the language mandated by Hastings to give this court jurisdiction. It reviewed a well-developed record. We conclude that the trial court was correct in concluding that its order was appealable under rule 9.130(a)(3)(C)(v).
Even if we had no jurisdiction of this proceeding as an appeal from a nonfinal order, we believe we could review this matter under our certiorari jurisdiction. This court has previously exercised certiorari jurisdiction to review issues related to sovereign immunity. See Stephens, 702 So.2d 517; Snyder, 826 So.2d 382 (reviewing by certiorari nonfinal orders denying defense of sovereign immunity). As explained in the next section, the trial court's concept of an "inevitable" accident as a method to establish gross negligence or an intentional tort is a departure from the essential requirements of the law that deprives the defendants of a statutory right to claim an immunity from suit. We cannot adequately remedy on direct appeal a legal error that denies an immunity created by the legislature to avoid trial in the first place. See, e.g., Pearlstein v. Malunney, 500 So.2d 585, 587-88 (Fla. 2d DCA 1986) (holding certiorari appropriate remedy to enforce presuit requirements in medical malpractice context).

IV. EMPLOYEES' LIABILITY FOR GROSS NEGLIGENCE
There is no question that Fleetwood could have devised a safer method to transport this roofing material. If the issue in this case were simple negligence, there would be enough negligence for all the parties to share. The issue in this case as it relates to the claim against the fellow employees, however, is whether a jury could permissibly find the conduct of the two coworkers so irresponsible that it fell to the level of gross negligence.
It is worth emphasizing that we address the issue of gross negligence in the context of workers' compensation immunity under section 440.11. Gross negligence has been a useful tool for both the common law and the legislature. It has *866 been employed in many different contexts.[5] It is doubtful that "gross negligence" has precisely the same meaning in each context. Justice England stated in Ingram v. Pettit, 340 So.2d 922 (Fla.1976):
Our jurisprudence reflects a history of difficulty in dividing negligence into degrees. The distinctions articulated in labeling particular conduct as "simple negligence," "culpable negligence," "gross negligence," and "willful and wanton misconduct" are best viewed as statements of public policy. These semantic refinements also serve a useful purpose in advising jurors of the factors to be considered in those situations where the lines are indistinct. We would deceive ourselves, however, if we viewed these distinctions as finite legal categories and permitted the characterization alone to cloud the policies they were created to foster. Our guide is not to be found in the grammar, but rather in the policy of the state in regard to highway accidents.
Id. at 924 (footnotes omitted). For example, a significant portion of our case law addressing and defining gross negligence has been written in the context of the much-maligned guest passenger statute.[6]See, e.g., Glaab v. Caudill, 236 So.2d 180 (Fla. 2d DCA 1970). Other cases rely on this term to decide whether "gross negligence" is sufficient for punitive damages. See W.R. Grace & Co. v. Waters, 638 So.2d 502 (Fla.1994). Thus, even when the definition of "gross negligence" remains constant, there is reason for concern that the standard of care created for one purpose may not be justified for use in another.
Perhaps the leading case defining "gross negligence" for purposes of the guest passenger statute was one of the last guest *867 passenger cases. In Glaab, 236 So.2d 180, Judge McNulty stated:
At the outset, we recognize that articulating the concept of gross negligence has always been difficult; and we submit that the root of the difficulty is the fact that, prior to Carraway v. Revell [116 So.2d 16 (Fla.1959) ], gross negligence was apparently fully equated with "wilful and wanton" negligence. The bench and bar have therefore been oriented to that equation. Since Carraway, however, it is clear that there is a difference between the two; but the semantic divorce separating them, it seems, has never quite been finalized. We hope our discussion here of gross negligence will at least discourage re-cohabitation.
By definition, it is now rudimentary that gross negligence is that act or omission which a reasonable, prudent man "would know would probably and most likely," result in an injury to another; and, from a standpoint of degree, it is clear that gross negligence lies between simple negligence and the "wilful and wanton" conduct sufficient, if death results, to constitute "culpable negligence" within the crime of manslaughter. But we would agree that such "* * * delimitation of `gross' or `wanton' negligence from other forms of negligence is neither conceptually satisfactory nor practically simple * * * "; so this case affords us an opportunity to suggest what we perceive to be a workable set of criteria to assist in the determination of prima facie gross negligence vel non in automobile guest-passenger cases.
Glaab, 236 So.2d at 182-83 (footnotes omitted).
Judge McNulty suggested three prongs to the usual analysis of gross negligence: (1) the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger; (2) chargeable knowledge of the danger; and (3) an act or omission, evincing a conscious disregard of consequences that is more than simple carelessness. Glaab, 236 So.2d at 183. As to this last factor, Glaab suggested that the probability that the consequences will result in injury must be "more than a real possibility, though not necessarily better than a 50-50 probability." Glaab, 236 So.2d at 184.
By comparison, current statutes authorize an award of punitive damages based on clear and convincing evidence of gross negligence. See § 768.72(2), Fla. Stat. (2000), amended by ch. 99-225, § 22, Laws of Fla.[7] This statute defines "gross negligence" to include "conduct [that] was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Id. This definition is arguably a little narrower than the common law definition and somewhat closer to the usual definition of "culpable negligence," which is reckless indifference or grossly careless disregard of human life. See Eller, 630 So.2d at 541 n. 3. This development suggests that most, if not all, cases against coworkers that are entitled to be presented to juries will now include a claim for punitive damages against the coworker. Again, we believe that the legislature intends such claims to be an exceptional event.
The procedure for transporting sheet metal that was devised by Fleetwood and implemented by Mr. Oliver and Mr. Miller may have been more dangerous than another method. On the other hand, it was a *868 procedure that had been successfully performed on many occasions over many years. By the time of this accident, from the perspective of Mr. Oliver and Mr. Miller, this procedure was a standard, proven method for moving the sheet metal through the narrow section of the aisle. In hindsight, there were safer ways to perform this task, but at the moment Mr. Miller was transporting the fatal load on April 1, 1991, it was not a procedure that an ordinarily prudent person, in light of the composite of circumstances, would regard as creating a clear and present danger. Likewise, after years of successfully performing this task, these men cannot be regarded as acting in conscious disregard for the safety of a coworker whose workplace was on the opposite side of the aisle from the pipe.
We disapprove the method by which the trial judge measured the degree of risk. The trial court concluded that this method of transport involved a level of risk to the workers and that if it were performed often enough or long enough, eventually it was "inevitable" that someone would be hurt or killed. However, any modestly dangerous activity at a workplace that is repeated often enough or long enough will eventually result in an accident. Although the concept of "gross negligence" examines the combination of circumstances to evaluate the relevant risk, it does not add together or cumulate the individual probabilities of an accident on each occasion to reach a conclusion that an accident is inevitable or that a risk is inordinately high. The tortfeasor's conduct must be evaluated in the context of the particular occurrence. In this case, if anything, the numerous successful performances of the challenged procedure show that a risk of accident on April 1, 1991, was far from imminent. This is not a case in which the employer continued to use the procedure after earlier mishaps or after it received warnings from other governmental or nongovernmental entities. Cf. EAC USA, Inc. v. Kawa, 805 So.2d 1 (Fla. 2d DCA 2001) (holding complaint stated claim for contribution from employer).
Accordingly, we reverse the trial court's order and require that final summary judgment be entered in favor of Mr. Miller and Mr. Oliver on remand.[8]

V. FLEETWOOD'S LIABILITY FOR AN INTENTIONAL TORT
The wrongful death claim against Fleetwood is premised on an intentional tort theory. The pleadings are designed to meet the rule announced in Turner, 754 So.2d 683 at 686, by alleging that Fleetwood "intentionally created a situation where injury or death was a substantial certainty." Turner, 754 So.2d at 688.[9] This is an objective test rather than a subjective one. The issue is whether a reasonable person in like circumstances to those of the employer would understand that the employer's conduct was substantially certain to result in injury or death. As the supreme court explained in Turner, this liability is permitted despite the exclusiveness of the workers' compensation remedy because the likelihood of injury is so high that the event cannot be regarded as an accident. Turner, 754 So.2d at 689.
The trial court denied summary judgment on this theory relying on reasoning *869 comparable to its reasoning on gross negligence. It concluded that if this method of transport were used long enough, an accident would be inevitable. Again, we do not believe that the supreme court in Turner intended to allow a plaintiff to add together small risks of injury in order to reach a combined total where the likelihood of injury to some employee sometime was substantially certain. If that were the case, then many injuries that occur while roofing or while performing any other moderately dangerous, repetitive job would be classified as the result of intentional torts.
We conclude that the undisputed evidence in the light most favorable to the plaintiff simply does not create a genuine issue of material fact under the high threshold required to establish an intentional tort in this context. Accordingly, we reverse and remand for entry of judgment in favor of Fleetwood.
Because these issues affect business throughout Florida and affect our jurisdiction over trial court orders deciding issues of workers' compensation immunity, we certify the following questions as questions of great public importance:
MAY A DISTRICT COURT REVIEW A NONFINAL ORDER DENYING, "AS A MATTER OF LAW," A MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF WORKERS' COMPENSATION IMMUNITY IF IT IS CLEAR THAT THE TRIAL COURT INTENDS TO SUBMIT THE ISSUE OF GROSS NEGLIGENCE OR INTENTIONAL TORT TO THE JURY AS A QUESTION OF FACT?
IF AN EMPLOYER ALLOWS ITS EMPLOYEES TO PERFORM A NEGLIGENT PROCEDURE REPEATEDLY AND FOR A LONG PERIOD, MAY THE FIRST INCIDENT IN WHICH THE PROCEDURE RESULTS IN INJURY OR DEATH BE TREATED AS AN INTENTIONAL TORT UNDER TURNER V. PCR, INC., 754 So.2d 683 (Fla.2000).
Reversed and remanded.
GREEN and WHATLEY, JJ., concur.
NOTES
[1] The actual second amended complaint is thirty-two pages in length and describes the facts in great detail. The summary in this opinion, however, should provide the reader with a satisfactory understanding of the lengthy allegations.
[2] Formerly, this provision read "that a party is not entitled to workers' compensation immunity as a matter of law."
[3] At best, it is plausible that a jury in such a trial might be allowed to understand that the defendant gets the benefit of a lower standard of care because workers' compensation benefits were provided by the employer and because the workers' compensation system is intended to be the exclusive remedy for most work-related injuries.
[4] Under this interpretation, this jurisdictional rule would allow review only in the very rare case where the trial court determined, as a matter of law, that the undisputed facts established that the defendant was not the statutory employer or a coworker. So interpreted, the rule would allow for appeal only when the trial court was planning to proceed to trial on the issue of the defendant's simple negligence because the trial court had rejected, as a matter of law, the claim that the defendant was an employer or fellow employee.
[5] See, e.g., Jacobs v. Seminole Canvassing Bd., 773 So.2d 519, 523 (Fla.2000) (applying gross negligence standard to misconduct for election officials); § 161.054, Fla. Stat. (2001) (violators of certain coastal environmental regulations); § 373.333, Fla. Stat. (2001) (water-well contractors), § 457.109, Fla. Stat. (2001) (acupuncture instructors); § 539.001(6)(a)(4), Fla. Stat. (2001) (pawnbrokers); § 686.402(10)(a), Fla. Stat. (2001) (individuals in franchise relationships who commit fraudulent misrepresentation).

"Gross negligence" by a government entity waives sovereign immunity in many contexts. See § 252.51, Fla. Stat. (2001) (conducts mock emergencies to train emergency personnel); § 316.0085, Fla. Stat. (2001) (when government provides skateboarding, inline skating, and freestyle bicycling facilities); 373.1395, Fla. Stat. (2001) (opens water district areas to public for free).
"Gross negligence" is also the applicable standard of care in many private contexts. See § 265.565, Fla. Stat. (2001) (duty owed by museums that accept certain items on loan); § 320.8249(9)(f), Fla. Stat. (2001) (defendants who install mobile homes); § 376.09(4), Fla. Stat. (2001) (remove cargo ship pollution); § 418.302, Fla. Stat. (2001) (certain activities at mobile home parks); 627.728, Fla. Stat. (2001) (duty owed by insurance companies that disclose false information in cancellation letter); § 713.31(2)(a), Fla. Stat. (2001) (liability for improper construction lien); § 725.06(1)(c), Fla. Stat. (2001) (prohibition for indemnity for such conduct in construction contracts); § 768.075(1), Fla. Stat. (2001) (duty owed by property owner to intoxicated trespasser); § 768.1325(4)(a), Fla. Stat. (2001) (use portable defibrillators to revive heart attack victims); § 768.136(2), Fla. Stat. (2001) (distribute food for free).
"Gross negligence" is a standard of legal malice in a claim of malicious prosecution, Durkin v. Davis, 814 So.2d 1246, 1248 (Fla. 2d DCA 2002), and false imprisonment, City of Hollywood v. Coley, 258 So.2d 828 (Fla. 4th DCA 1971).
"Gross negligence" can violate professional or legal duties. See Fla. Bar v. Mason, 826 So.2d 985 (Fla.2002) (holding that an attorney was guilty of gross negligence by violating Rule Regulating Florida Bar 4-8.4(c) for improperly maintaining funds in a trust account).
[6] The guest passenger statute, § 320.58, Fla. Stat. (1971), was repealed in 1972. Ch. 72-1, Laws of Fla.
[7] This statute apparently overruled earlier case law that prohibited punitive damages based on gross negligence. See Como Oil Co. v. O'Loughlin, 466 So.2d 1061, 1062 (Fla. 1985).
[8] On appeal, Mr. Oliver has made an argument that he is a supervisor entitled to be judged by the culpable negligence standard. Because we conclude that he is not liable under the gross negligence standard, which is a higher standard, we do not reach this issue.
[9] We note that the pleading does not identify the relevant intentional tort. We assume that the relevant intentional tort in both Turner and this case is battery.