1 So.3d 294 (2009)
Rodolfo CASAS, Appellant,
v.
SIEMENS ENERGY AND AUTOMATION, INC., Appellee.
No. 3D04-742.
District Court of Appeal of Florida, Third District.
January 14, 2009.
*295 Donna B. Michelson, Coconut Grove; Philip D. Parrish, Miami, for appellant.
Ruden, McClosky, Smith, Schuster & Russell and John H. Pelzer, Ft. Lauderdale and Brigid F. Cech, Miami, for appellee.
Before COPE, RAMIREZ, and WELLS, JJ.

On Remand from the Supreme Court of Florida
COPE, J.
This case is before us on remand from the Supreme Court of Florida. The question is whether the defendant-appellee Siemens Energy and Automation, Inc., is entitled to workers' compensation immunity. The trial court granted summary judgment for the employer on that issue. We conclude that there are disputed issues of material fact and remand for further proceedings.

I.
Plaintiff-appellant Rodolfo Casas was a machine set-up operator for the operation of a mechanical punch press machine which stamped metal lids. His duties included setting up the machine for operation and actually operating it.
The plaintiff had been instructed that if a metal lid became stuck in the machine, the plaintiff should remove it with a long metal rod or with a long screwdriver. While attempting to clear a stuck metal lid, the machine cycled and crushed the plaintiff's arm.
The plaintiff sued the defendant employer. The defendant claimed workers' compensation immunity. The plaintiff countered by invoking the intentional tort exception to workers' compensation immunity. Under that exception, "in order to prove an intentional tort, the employer *296 must be shown to have either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Turner v. PCR, 754 So.2d 683, 687 (Fla.2000) (citation omitted).[1]
The defendant moved for summary judgment, arguing that the circumstances of the case did not fall within the intentional tort exception to workers' compensation immunity. The trial court agreed with the defendant and entered summary judgment.
On appeal, a divided panel affirmed. Casas v. Siemens Energy & Automation, Inc., 927 So.2d 922 (Fla. 3d DCA 2006) ("Casas I"). The majority opinion relied in part on The Bombay Company v. Bakerman, 891 So.2d 555 (Fla. 3d DCA 2004) ("Bakerman I"), which was subsequently quashed by the Florida Supreme Court. Bakerman v. The Bombay Company, Inc., 961 So.2d 259 (Fla.2007) ("Bakerman II").
The Supreme Court thereafter quashed this court's opinion in Casas and remanded to this court "for reconsideration upon application of this Court's decision in Bakerman II." Casas v. Siemens Energy & Automation, Inc., 969 So.2d 356 (Fla.2007) ("Casas II").

III.
The present case is similar to Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), as modified by Turner, 754 So.2d at 691 n. 8 (Fla.2000). The Lawton facts were:
Alpine Engineered Products purchased a punch press from Federal Press Company in 1972. In 1981 Carl Lawton, a punch press operator employed by Alpine, caught his hand in the press when a co-worker accidentally put the press into operation as Lawton attempted to adjust the machine. The press crushed Lawton's hand and caused the loss of all the fingers on that hand. Following the accident, Lawton applied for and received workers' compensation benefits from Alpine's insurance carrier and filed suit against Federal Press Company. During the course of discovery, Lawton learned that between February 1972 and August 1980 Alpine had received numerous written communications from Federal Press informing Alpine that, for safety reasons, point of operation guards should be provided on the press and that operators should be instructed about the various dangers involved in operating the press.
498 So.2d at 880 (emphasis added). The Florida Supreme Court has stated that the foregoing facts were sufficient to support an allegation of substantial certainty of injury. Turner, 754 So.2d at 691 n. 8.
In the present case, the defendant's plant manager, John Samilian, testified that the plaintiff was given extensive training on how to operate the press at issue here, Machine 409. Deposition of John Samilian ("Samilian Deposition"), Oct. 15, 2002, at 122. Machine 409 had a Plexiglas guard which was designed to prevent an operator from placing his hand in the working area of the machine.[2] According *297 to the manager, the plaintiff was instructed to clear a jam by using a metal rod which could be inserted in a small opening in the Plexiglas guard. If that was not successful in clearing the jam, then the operator was to turn off the electrical power and insert a metal dowel which would prevent the press from descending. When that had been done, it was permissible for the operator to bypass the Plexiglas guard and clear the jam by hand. The defense claims that the plaintiff received one-on-one, on the job training with an experienced press operator before he was allowed to operate Machine 409 by himself.
We are obligated to read the record in the light most favorable to the plaintiff as the nonmoving party. See St. Joe Corp. v. McIver, 875 So.2d 375, 377 (Fla.2004). The plaintiff in this case denied that he had received extensive training on this machine prior to beginning to operate it. Deposition of Rodolfo Casas ("Plaintiff's Deposition"), Dec. 12, 2002, at 20-23. He stated that he had short intervals of training by a coworker. Id. He began operating the machine by himself "[p]ractically since the first day." Id. at 23. He was given no written materials, id., and simply received on the job training. While the plant manager testified about the company's training procedures, the plant manager acknowledged that training was handled by the supervisors and group leaders and was not handled by the manager personally. Samilian Deposition at 127. For present purposes, we accept the plaintiff's version of the facts.
On the day of the accident, the Plexiglas guard was not on the machine. Under the defendant's procedures, a set-up operator like the plaintiff was allowed to remove the Plexiglas guard. The defendant maintains that the plaintiff removed the Plexiglas guard himself, while the plaintiff apparently denies this. See R. 977.[3] It is, however, immaterial who removed the Plexiglas guard.
The plaintiff testified that he had been told it was unnecessary to turn the power off before reaching into the machine to clear a jam. The plaintiff testified in part:
Q. Well, is there a way to completely shut the machine down either by turning off the electricity or turning off an on or off switch or unplugging it?
A. Yes, there is a switch that you would turn everything off completely.
Q. Where is that switch located?
A. At one side of the machine.
Q. Don't you think it would be good, common sense to turn that switch off and turn the machine off if something got stuck in the machine and you have to fix it?
A. Yes.
Q. Did you ever do that?
A. No, because a supervisor would say that it was not necessary to turn off the machine.
Plaintiff's Deposition at 38-39 (emphasis added).
Again:
Q. But you certainly knew from common sense before this accident that you should never put your hands in the zone of danger under the ramp?
A. Supposedly, if I am not touching the controls, the machine has no reason to go down or up.
Id. at 55. The plaintiff's understanding was: "Well, supposedly if one is not using the controls, the machine remains off." Id. at 37.
*298 In the Lawton case, the press did not have point of operation guards, and the operators had not been instructed on the various dangers involved in operating the press. 498 So.2d at 880. The situation is similar here. Machine 409 had a Plexiglas guard, but it had been removed. The real problem here is that by the plaintiff's account, the supervisor had told him that it was permissible to leave the electrical power on while clearing a jam. The plaintiff had the impression that it would be impossible for the machine to cycle so long as he stayed away from the controls.
At the time of the accident, the plaintiff was operating the machine using the foot controls rather than the hand controls. The plaintiff denied that he stepped on the foot controls and testified that the machine inexplicably cycled when he dislodged a stuck metal part by reaching into the machine using a foot-long screwdriver. The machine descended and caught his hand in the press. The plaintiff testified that there had been electrical problems with the machine and believed that was the cause of the accident. The defendant tested the machine after the accident and reported that the machine controls were operating normally.
At the summary judgment hearing plaintiff's counsel said it appeared the plaintiff had become distracted while attempting to clear the jam and inadvertently stepped on the foot pedal. Because of the concession at the summary judgment hearing below, we accept the proposition that the plaintiff inadvertently stepped on the foot pedal. In reality, the plaintiff denies this. Under either state of facts, reversal is required.
The point of requiring safety devices and proper training is to prevent inadvertent injury while operating dangerous equipment. It is obvious that the press involved in this case presents the opportunity for serious injury, whether through distraction, fatigue, or operator error. Plant manager Samilian testified in deposition that it is expected that employees on a production case will make mistakes.
Safety devices are required precisely because human beings are fallible. As the defendant's corporate director of safety testified in deposition, with these machines there are no second chances. Deposition of Walter Hazelwood, Feb. 19, 2003, at 110.
The defendant may have had an excellent training program on paper, but the plaintiff's testimonywhich we must accept as true for present purposeswas that the reality fell far short of what was described in the defendant's depositions. The plaintiff's testimony was that he had been taught that it was safe to clear a jam by extending one's hand into the working area of the machine without turning off the power. Accepting that testimony as true, the plaintiff had been misled about the risk. That testimony would, if believed by the jury, satisfy the substantial certainty test. See Turner, 754 So.2d at 691 n. 8; Lawton, 498 So.2d at 880.
In finding the substantial certainty test to be met, the Lawton decision cited an absence of safety equipment and lack of training about the dangers in operating the press. 498 So.2d at 880, as modified by Turner, 754 So.2d at 691 n. 8. At oral argument, the defendant contended that Lawton establishes an eitheror test: the employer may choose either to provide safety devices or training, but is not required to provide both. The defendant maintains that it provided training and therefore did not have to provide safety devices. We reject that reading of Lawton. Clearly, Lawton contemplated that the employer would supply appropriate safety devices, training in the use of those *299 devices, and training in the operation of the equipment.

IV.
We next consider, pursuant to the remand instructions, the effect of Bakerman II.
In Casas I, the majority based its affirmance partially on Bakerman I. The Casas I panel said that cases finding the substantial certainty test to be met "contain `a common thread of evidence that the employer tried to cover up the danger [to its employees], affording the employees no means to make a reasonable decision as to their actions.'" 927 So.2d at 925. The panel went on to say that in the present case, "[t]he element of cover up, deception or concealment of a known danger ... is missing...." Id. at 927.
The Bakerman I decision had ruled that concealment was a required element where the plaintiff wished to show that an employer had engaged in conduct which was substantially certain to cause injury or death. 891 So.2d at 557. In Bakerman II, the Florida Supreme Court reversed on that issue and ruled that concealment is not an essential factor in the substantial certainty test. 961 So.2d at 264. Instead, "concealment of the dangerous condition is only one of several factors in a nonexclusive list." Id.
The decision in Bakerman II removes one of the bases on which the Casas I panel had affirmed the summary judgment. To the extent that concealment remains one factor to be considered, the plaintiff maintains that there is an element of concealment here, namely, the plaintiff says he had been taught it was safe to clear a jam by extending one's hand into the working area of the machine without turning off the power.

IV.
For the stated reasons, there are disputed issues of material fact regarding whether the substantial certainty test was met. We reverse the summary judgment and remand the case for further proceedings consistent herewith.
RAMIREZ, J., concurs.
WELLS, J. (dissenting).
I respectfully dissent. Upon consideration of Bakerman v. The Bombay Co., 961 So.2d 259 (Fla.2007), and the parties' supplemental arguments on remand, I would again affirm entry of summary judgment in favor of Rodolfo Casas' employer, Siemens Energy and Automation, Inc. I would do so because the pleadings and discovery demonstrate that, as a matter of law, Casas' claim does not fall within the intentional tort exception to workers' compensation immunity.
As the majority herein states, our original opinion in this case relied in part on this Court's earlier decision in The Bombay Co. v. Bakerman, 891 So.2d 555 (Fla. 3d DCA 2004) ("Bakerman I"), which "effectively held concealment to be an indispensable criterion of the substantial certainty analysis of the intentional tort exception [to workers' compensation immunity]." Bakerman v. The Bombay Co., 961 So.2d 259, 263 (Fla.2007) ("Bakerman II"). Now that the Florida Supreme Court has quashed Bakerman I, holding that this Court erred in adding concealment as an essential element to the substantial certainty test, this case has been remanded to us for reconsideration without that element. See Casas v. Siemens Energy & Automation, Inc., 969 So.2d 356 (Fla.2007) ("Casas II").
Since our decision in Casas v. Siemens Energy & Automation, Inc., 927 So.2d 922 (Fla. 3d DCA 2006) ("Casas I"), did not *300 turn on the now discredited concealment element, I would affirm for the same reasons stated in that opinion. Moreover, after two sets of briefings and two oral arguments, there is no dispute as to the facts relevant to whether an intentional tort has been committed. More specifically, in April 2000, Rodolfo Casas was hired by Siemens to operate a mechanical punch press machine, referred to as machine 409, which made metal lids. At the time Casas was hired, this machine had been in operation for thirty-four years, during which time various punch press operators had operated it sixteen hours a day (two eight-hour shifts) without incident or injury.[4] Although this machine was scheduled for upgrades to its point of operation guards, at the time Casas was injured it was fitted with Plexiglas point of operation barriers which were OSHA compliant.[5]
The undisputed evidence was that Casas received one-on-one training with an experienced operator as to how to use machine 409. He was taught how to change the die (the part of the machine that determined which part was being made) and was instructed on how to clear a jam from the press area. He was also instructed never to put his hands or any part of his body into the press area, and if it became necessary to clear material stuck in the press, he was to use a long metal rod, or screwdriver, inserted through a hole in the machine's point of operation Plexiglas barrier, to clear the jam.
Despite this training and instruction, on September 1, 2000, Casas' arm was accidentally crushed when he stuck it, and the tool he was allegedly holding, into the machine in order to dislodge a stuck metal lid. At the time, the Plexiglas guards were not in place, and the machine had not been shut off. The parties agree that the accident likely happened when Casas stepped on the machine's foot pedal while his arm was inside the machine.
Casas received workers' compensation for this injury. He also brought suit against Siemens, seeking to avoid application of the immunity conferred by the workers' compensation laws because Siemens had committed an intentional tort: (1) by inadequately training him; (2) by requiring him to work with an inherently dangerous machine which often malfunctioned and was in need of safety upgrades; and, (3) by failing to "have any point of operation guards in place for ... safe usage." Siemens moved for summary judgment, arguing that the intentional tort exception to workers' compensation immunity did not, as a matter of law, apply in this case. Summary judgment in favor of Siemens was granted.
This judgment should have been, and should now be, summarily affirmed because Casas' claim is supported by neither the law nor the record and is, at best, a negligence claim that cannot trump workers' compensation immunity.
Florida's workers' compensation law, codified in chapter 440 of the Florida Statutes, provides a "no-fault system," under which "the employee gives up a right to a common-law action for negligence in exchange *301 for strict liability and the rapid recovery of benefits." Turner v. PCR, Inc., 754 So.2d 683, 686 (Fla.2000). This statutory scheme provides immunity to covered employers from common-law negligence suits, while providing employees with benefits on a no-fault basis. Id.
"Notwithstanding the general recognition of tort immunity for employers, the [Florida Supreme Court] has recognized an intentional tort exception to the worker's compensation statutory scheme." Id. Under the intentional tort exception, an employee must show that the employer "either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Id. at 687 (quoting Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla.1986)).[6]
Whether conduct is substantially certain to cause injury or death is determined by applying an objective standard, that is, by determining whether a reasonable person would understand that the employer should have known that its conduct was substantially certain to result in injury or death to the employee. Id. at 688-89; Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 782-83 (Fla.2004). Under this standard, the employee must also demonstrate that the employer engaged in conduct more egregious than that needed to establish gross negligence. Turner, 754 So.2d at 687 n. 4. Casas' claims that he was not "adequately trained," that the machine he worked on was dangerous and often malfunctioned, and that it had no safety devices do not, on the record before us, satisfy this test.
As to Casas' training claim, there is no testimony whatsoever in this record as to what training, if any, is mandated for operators of this or any other punch press machine, and the only testimony about the actual training that Casas received came from the man who trained him. That witness testified that Casas received one-on-one training on machine 409 for a period of three monthswith Casas first only observing for a month and a half, then with Casas operating the machine while the trainer observed for another month and a half, and finally with Casas operating the machine by himself.
Casas does not contradict this testimony; he simply tries to re-characterize it:
Q. Did you have any training to know how to operate this machine before you started working on the machine?
A. Very little training with a co-worker.
. . . .

*302 Q. And he had more experience on the machine than you did?
A. Yes.
Q. How much time would it take to show you how to operate this machine?
A. He would show me for short whiles. Anything that I need to ask him, I would ask him but I would continue working on the machine.
Q. So you received on-the-job training?
A. Yes.
Q. Did you feel that you received adequate training in order to properly know how to work this machine?
A. Legally, no.
. . . .
Q. When you began, did there come a time when after [the trainer] showed you how to operate the machine that you began operating the machine by yourself?
A. Yes.
Q. When did you start operating the machine by yourself?
A. Practically since the first day.
Q. Since April of 2000?
A. Yes.
No matter how characterized, the facts detailing the training Casas received remain unchanged: first he watched while someone else operated the machine; then he operated the machine while someone watched him; then he operated the machine alone for four months before he was injured. As for training about whether body parts should be placed in the press other than the obvious, that is, that no part of one's body should be placed inside a machine the function of which is to slam down on a piece of metal with such force as to mold the metal into an electrical lid coverCasas was told: do not put your hands into the press without turning it off; otherwise, insert a metal rod or long screwdriver (provided to him) into a hole in the Plexiglas point of origin guard (yes, one did exist) to remove a jam.[7] This training and instruction, combined with the fact that no injuries had occurred for over thirty-four years during operation of machine 409 establishes that Siemens was not deliberately indifferent to known hazards and dangers making it substantially certain that employees would be injured or die and that summary judgment was properly granted.
The decision in Bourassa v. Busch Entertainment Corp., 929 So.2d 552 (Fla. 2d DCA 2006), supports this result. In Bourassa, part of a zoo employee's arm was bitten off while feeding a lion. There, an employee performing a dangerous job had been trained (as had Casas) first by observing, then by performing under supervision, and lastly by performing alone. Specifically, in Bourassa, the employer, a private zoo, decided to use positive reinforcement to train one of its lions to permit zoo employees to draw blood from it rather than using the standard procedure of putting the lion to sleep for this purpose. To accomplish this end, zoo employees were trained to "herd" the lion from one cage into another by controlling the gates between different cages and for one employee to feed the lion through the bars of a cage while two other employees drew blood from the lion's tail. Despite this training, one of the employees whose job it was to feed "treats" to the lion while blood was being drawn from its tail, lost her hand and part of her arm when the lion *303 grabbed her fingers and pulled her hand into the cage.
While recognizing that "a full-grown male lion [is] an extremely dangerous animal," the Bourassa court nonetheless affirmed summary judgment in the employer's favor. Id. at 557. It did so, in significant part, because the employer had a training program in place and because the procedure "had been performed several times a week for at least four years before the accident involved... with no prior injuries," thereby demonstrating that the employer "did not ignore evidence of prior accidents, injuries, or known safety hazards." Id. The same reasoning applies here. While working on a punch press machine obviously can be dangerous, Casas' employer had a training program in place and Casas participated in it. Moreover, before Casas was injured, machine 409 had been in continuous operation without incident sixteen hours a day, for thirty-four years. Thus, as in Bourassa, there is no evidence here that the employer exhibited deliberate indifference to known hazards and dangers or to employee safety so that it was substantially certain that injury or death would result from operation of machine 409.
The fact that machine 409 was dangerous and malfunctioned from time to time, again as precedent teaches, also provides no basis for circumventing the workers' compensation laws. In Tinoco v. Resol, Inc., 783 So.2d 309 (Fla. 3d DCA 2001), this Court affirmed summary judgment for an employer in an action brought by an employee whose foot was crushed by an excavating machine. In that case, the job foreman and crew working with the machine knew that it was malfunctioning, lurching forward two or three feet every time the operator sought to move it, yet continued to use it until after approximately twenty or so uses, one of the workers was seriously injured. Despite the fact that the machine was dangerous and malfunctioning, this Court found no basis for avoiding workers' compensation immunity because the facts when viewed in a light most favorable to the employee, demonstrated only negligence, not a substantial certainty of injury or death:
We concur with the trial court that the facts of this case do not show that the employer `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.' Viewed in the light most favorable to the plaintiff, the circumstances demonstrate negligence. But under the case law, a showing of negligence, or even gross negligence, is not enough.
Id. at 310-11 (citation omitted).
The same must be said here. As explained in Fleetwood Homes of Fla., Inc. v. Reeves, 833 So.2d 857, 868 (Fla. 2d DCA 2002), quashed on other grounds, 889 So.2d 812 (Fla.2004), any dangerous activity, repeated often enough eventually will result in an accident. This does not make such accidents substantially certain to happen:
[A]ny modestly dangerous activity at a workplace that is repeated often enough or long enough will eventually result in an accident. Although the concept of `gross negligence' examines the combination of circumstances to evaluate the relevant risk, it does not add together or cumulate the individual probabilities of an accident on each occasion to reach a conclusion that an accident is inevitable or that a risk is inordinately high. The tortfeasor's conduct must be evaluated in the context of the particular occurrence. In this case, if anything, the numerous successful performances of the challenged procedure show that a *304 risk of accident ... was far from imminent. This is not a case in which the employer continued to use the procedure after earlier mishaps or after receiving warnings from other governmental or nongovernmental entities.
Id. at 868, 869; see also Allstates Fireproofing, Inc. v. Garcia, 876 So.2d 1222, 1226 (Fla. 4th DCA 2004) (stating that an injured worker "cannot add together all of the small risks of injury created by [the employer's] conduct `in order to reach a combined total where the likelihood of injury to some employee sometime was substantially certain'" (quoting Fleetwood, 833 So.2d at 869)).
In this case, an employee was injured while performing a repetitive, moderately dangerous job, a job which he had performed alone without injury for months. This same job had been performed by a number of other employees literally thousands of times over a thirty-four year period of time, all without incident. In this context, it cannot be said that the employer should have known that it was substantially certain that injury or death would follow from operation of this machine so as to circumvent the workers' compensation laws.
I also cannot agree that reversal of the summary judgment entered below is mandated by the Florida Supreme Court's statement in Turner that it was receding from its earlier decision in Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla. 1986), "to the extent [that Lawton] can be read as rejecting the facts as stated therein as a sufficient basis to support an allegation of substantial certainty of injury." Turner, 754 So.2d at 691 n. 8.
With all due respect to the majority herein, the allegations referred to in Turner as being sufficient to support an allegation of substantial certainty of injury were not limited to the allegations, quoted here by the majority, that the employer in that case had been warned on numerous prior occasions that "for safety reasons, point of operation guards should be provided on the press and that operators should be instructed about the various dangers involved in operating the press." Majority opinion at 296 (quoting Lawton, 498 So.2d at 880). Rather, as the dissent in Lawton confirms, the Lawton complaint alleged that in addition to ignoring the manufacturer's numerous warnings to install point of operation guards, the employer had intentionally disabled all safety features of the punch press at issue and had affirmatively denied the injured worker the right to use any safety mechanisms:
Lawton's third amended complaint set forth several other allegations that the majority of this Court has apparently overlooked. Lawton alleged that [his employer] affirmatively removed any and all ramblocks or other inside guards provided by the manufacturer and/or affirmatively denied Lawton the right to use other ramblocks and/or inside guards. The complaint also alleged that [the employer] intentionally exposed its workers to serious injury and/or death by intentionally refusing to follow the law and regulations concerning the safety of its workers, and such actions constituted an intentional and/or reckless intent to cause injury or death to its own workers.
Lawton, 498 So.2d at 881 (Adkins, J., dissenting).
Nothing remotely similar was alleged here. Casas alleges only that machine 409 had no point of operation guards. Nowhere does he allege or claim that Siemens refused to install recommended safety features that it disabled safety features, or that it refused to allow employees to use them.
*305 Moreover, unlike Lawton, in which a summary judgment was entered on bare pleadings, this case involves a summary judgment following substantial discovery. The unrebutted evidence adduced during discovery shows that machine 409 had point of operation guards. The unrebutted evidence also was that: (1) these Plexiglas point of operation guards were OSHA compliant, see 29 CFR § 1910.217(c)(2)(iii) (approving for use as point of operation guards a "fixed barrier guard") and had been on machine 409 for at least ten years before Casas' injury[8]; (2) Siemens' policy was that no press was to be operated without its point of operation guards and that, if a supervisor saw one operating without its guards, it was to be shut down immediately[9]; (3) Siemens, which had purchased the facility where Casas worked shortly before he was injured, had on its own initiative already hired experts, conducted a survey, and begun upgrading the point of operation guards for all of its presses, including machine 409, by the time of Casas' injury; and, (4) on the day Casas was injured, the Plexiglas guards for machine 409 were found lying on the ground beneath the machine.
Thus, while the pleadings in Lawton may have been sufficient to state a claim that might avoid the immunity conferred by the workers' compensation laws, the record before the court below in this case was inadequate to sustain a claim under that or any other precedent. Therefore, on reconsideration, I would still conclude that although Bakerman II necessarily eliminated one of our reasons for initially affirming summary judgment in favor of Siemens in this case, the remainder of our reasons supports the same outcome. Indeed, even assuming that Casas has adequately alleged facts sufficient to support an allegation of "substantial certainty of injury" under Lawton, those allegations are conclusively refuted by the record.
For these reasons, I would affirm the summary judgment entered below and therefore respectfully dissent.
NOTES
[1] The Turner decision has been superseded by a 2003 legislative amendment, see Pendergrass v. R.D. Michaels, Inc., 936 So.2d 684, 689-90 n. 1 (Fla. 4th DCA 2006), but the amendment does not apply retroactively. Cabrera v. T.J. Pavement, Corp., 33 Fla. L. Weekly D2681, 2682 n. 4, ___ So.3d ___, ___ n. 4, 2008 WL 4922600 (Fla. 3d DCA Nov. 19, 2008); FCCI Ins. Co. v. Horne, 890 So.2d 1141, 1143-44 (Fla. 5th DCA 2004).
[2] The witnesses disagreed about the number and configuration of guards for the machine. The machine had been manufactured in the 1960s and at some subsequent time a guard or guards were made for the machine.
[3] This question was not covered in the Plaintiff's Deposition. At the summary judgment hearing, the plaintiff's counsel stated that the plaintiff denied removing the guard. R. 977.
[4] In fact, the record shows that no one had sustained a serious crushing injury in any of the twenty or so other presses operated at the plant where Casas worked for at least twenty years before Casas was injured. The only evidence of any press injury other than Casas' comes from a workers' compensation report which states that in October 1999 an employee's finger was lacerated by a brake press requiring "first aid" at a local hospital but no loss of work time.
[5] The uncontradicted evidence was that following Casas' injury, the guards were found on the ground at the base of the machine. Obviously, they had to exist.
[6] In 2003, the Florida Legislature codified this court-created intentional tort exception to the workers' compensation law, but in doing so, adopted a stricter "virtual-certainty standard," thereby modifying the standard announced in Turner. See Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 784 n. 5 (Fla. 2004) (citing ch. 2003-412, § 14, at 3890-91, Laws of Fla.). Under this provision, which became effective October 1, 2003, an injured employee can satisfy the intentional tort exception and thereby avoid the exclusive remedy provisions of the workers' compensation law: "by proving by clear and convincing evidence that his employer `deliberately intended to injure him' or that his employer `engaged in conduct that the employer knew, based on prior similar accidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee, and the employee was not aware of the risk because the danger was not apparent and the employer deliberately concealed or misrepresented the danger so as to prevent the employee from exercising informed judgment about whether to perform the work.'" Id. (quoting § 440.11(1)(b)(2), Fla. Stat. (2003)). Because the incident in this case occurred in 2000, the 2003 amendment, with its stricter standard, does not apply.
[7] Casas testified that his supervisor told him that it was unnecessary to turn the power off when removing a stuck metal lid from within machine 409 with the aid of a long tool. Because the tool, not the operator's hand, would be in the press, there is nothing "inadequate" about this.
[8] The uncontradicted evidence was that machine 409 was equipped with two one-half inch thick Plexiglas guards at its front and left sides and metal guards on the machine's right side where the metal feeder was located. There were no guards on the backside of the press, which could be accessed only by crawling under it.
[9] Both a supervisor at the plant where Casas worked and the employee who worked next to Casas (and who operated this press for ten years before he trained Casas to run it) testified that they had never seen machine 409 operate without the plastic guards in place.