568 So.2d 448 (1990)
Karen Ruth CONNELLY, Individually, and As Administratrix and/or Personal Representative of the Estate of Joseph Robert Connelly, Deceased, Appellant,
v.
ARROW AIR, INC., Appellee.
No. 89-806.
District Court of Appeal of Florida, Third District.
July 3, 1990.
Rehearing and Rehearing Denied November 6, 1990.
*449 Barranco, Kellough & Kircher and Steven Kellough, Miami, for appellant.
Pyszka, Kessler, Massey, Weldon, Catri, Holton & Douberley and Edward D. Schuster, Fort Lauderdale, Thornton, David, Murray, Richard & Davis and Aurora Ares, Miami, for appellee.
Before BASKIN, FERGUSON and JORGENSON, JJ.
Rehearing and Rehearing En Banc Denied November 6, 1990.
FERGUSON, Judge.
Appellant, the widow of an airline co-pilot who was killed in the course of his employment, brought this wrongful death action against the employer, Arrow Air, alleging that the workers' compensation immunity provided by section 440.11(1), Florida Statutes (1983), is not a bar because the employer's conduct which caused her husband's death was so outrageous as to amount to an intentional tort. This appeal is brought from a final summary judgment for the employer on a determination that the conduct complained of did not rise to the level of an intentional tort.
In several cases, the Supreme Court of Florida has indicated that the burden of an employee to prove that an employer's act of negligence rose to the level of an intentional infliction of harm, although heavy, is not impossible.[1] The question presented is whether the evidence, viewed in a light most favorable to the appellant, demonstrated conclusively that the employer's actions were not "substantially certain" to cause injury or death to its employees.
Arrow Air's flight 950, a DC-8 aircraft, crashed on December 12, 1985, during take-off after a refueling stop in Gander, Newfoundland en route from Cairo, Egypt. All eight members of the crew, as well as the 248 United States servicemen aboard, were killed. The flight was being operated pursuant to a contract with the Multinational Force and Observers (MFO) by terms of which Arrow agreed to transport military troops between the United Arab Republic and the United States. Arrow realized over two million dollars in revenue from the MFO contract. There is evidence that Arrow, to avoid losing the lucrative deal, intentionally misstated its capacity to carry the mandatory maximum weight and that, in fact, Arrow had, prior to the crash, sold the last plane it owned which was capable of complying with MFO weight requirements. Arrow, according to the appellant's witnesses, consciously pursued a course of conduct which subordinated passenger and crew safety to concerns for company profits.
Former Arrow pilots testified, at congressional hearings before the Permanent Subcommittee on Investigations on Airline Safety, that they were overworked and coerced economically to fly more hours than FAA regulations permitted, and that they routinely operated the aircraft in a defective condition because the company's operational losses necessitated cost-cutting measures in the form of deferred maintenance and repairs. Malfunctioning items on Arrow planes were reported only on in-bound trips so as to eliminate costly non-base repair expenses and flight delays. At *450 other times only marginal maintenance was performed, leading to unsafe conditions.
Problems with the exhaust gas temperature (EGT) for flight 950's number four engine, noted fifteen times from October through December 1985, were ignored. A malfunctioning EGT gauge was detected on the Cairo-Cologne leg of the trip, preceding the arrival to Gander but, allegedly, the relief flight crew was purposefully not notified of the problem. In order to keep the engine temperature within take-off limits the crew was required to retard the throttle, thereby reducing thrust and power. There was testimony that prior elevated EGT temperature and recurrent compressor stalls, or disruptions of air flow through the engine, were not corrected. Former employees detailed a history of sticking thrust reversers on the same plane, and failure to have the reverser brushings in overhaul condition. Twenty write-ups on the leaking hydraulic system were documented between June and December 1985. Thirteen quarts of hydraulic fluid were added before the Gander take-off.
According to one witness, Arrow deliberately used an average of passenger weights in order to conceal the actual flight load which, in all likelihood, exceeded the zero fuel or maximum allowable structural limits take-off weight  critical to assure the calculation of correct speed. The use of lower speed, based on the lighter weights calculated by the previous Cairo crew, resulted in reduced thrust and degraded take-off performance. By one account, the aircraft load may have exceeded the basic operating weight by 10,000 pounds. Consistent with that opinion there was testimony that the aircraft seemed to "fly heavy."
It was further alleged that the flight was not airworthy and was operated in violation of FAA regulations because of 1) missing cargo compartment panels, 2) thrust reverser lights signalling an EGT problem, 3) engine four's elevated temperature (forty degrees higher than other engines), 4) elevator control column ratcheting, and 5) excessive use of hydraulic fluid to beef up the defective main system. The cockpit voice recorder (CVR) was also inoperable. A former Arrow pilot, Captain Daniel Hood, testified about the company's deficient maintenance practices prior to the crash, specifically, the history of sticking thrust reversers and hydraulic fluid leakage. Another former Arrow pilot testified that repairs were slipshod, such as the use of garden hose washers in place of seals to correct hydraulic fluid leaks.
Four days before the crash Hood's fiancee, a stewardess on flight 950, called him in Florida from California to tell him of a problem with an engine which Arrow was not going to have repaired until the plane completed its rotation back to the United States from Europe and the Middle East. She described it as a "compressor stall," and that it was "the same problem that we always have, with the engine backfiring and so forth." He advised her to quit and get off the plane but she said that she was going to make this last flight and would leave Arrow's employ when she returned to the United States. She was one of the crew members who died in the air crash. There was substantial and competent evidence in the record that defective conditions in the aircraft, including the overloading, all known to the employer, were contributing factors in the crash.
In Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882 (Fla. 1986), the court held that the negligent conduct of an employer, that it knew would "probably" result in injury to an employee, did not reach the level of an intentional tort and thus the Workers' Compensation Act provided the employee's sole remedy. Citing its earlier opinion in Spivey v. Battaglia, 258 So.2d 815 (Fla. 1972), the court reasoned: "In order for an employer's [negligent] actions to amount to an intentional tort the employer must ... engage in conduct which is substantially certain to result in injury or death."
The alleged routine practices of the employer in this case constituted flagrant violations of FAA rules pertaining to air safety, as well as the manufacturer's maintenance and repair manuals. The accident *451 which took the life of the victim was, by one version of the evidence, proximately the result of the dangerous maintenance and operational practices the safety measures were designed to protect against. In our view, the above-quoted Fisher language rings hollow if the plaintiff's facts in this case are not sufficient to survive a summary judgment motion.
It is quite reasonable to conclude, as a matter of law, that a passenger aircraft which is routinely overloaded and poorly maintained, with known mechanical deficiencies including a leaking hydraulic system, regular engine stalls, overheating, and faulty thrust reversers, will  to a substantial certainty  eventually succumb to the incessant forces of gravity causing serious injury to, or the death of, those aboard. Further, where the employer, as in this case, withholds from an employee, knowledge of a defect or hazard which poses a grave threat of injury so that the employee is not permitted to exercise an informed judgment whether to perform the assigned task, the employer will be considered to have acted in a "belief that harm is substantially certain to occur." Jones v. VIP Dev. Co., 15 Ohio St.3d 90, 96, 472 N.E.2d 1046, 1052 (1984).
There is evidence which refutes the testimony given by the appellant's witnesses as to Arrow's operational practices. That evidence, however, merely creates issues of fact. It is not the role of the trial judge, in ruling on a summary judgment motion, to weigh the evidence for the purpose of resolving the conflict. City of Live Oak v. Arnold, 468 So.2d 410 (Fla. 1st DCA 1985); Kent Ins. Co. v. Glades Liquors, Inc., 418 So.2d 1101 (Fla. 3d DCA 1982), rev. denied, 429 So.2d 6 (Fla. 1983); Davis v. Hathaway, 408 So.2d 688 (Fla. 2d DCA 1982); Burkett v. Parker, 410 So.2d 947 (Fla. 1st DCA 1982); Campanella v. Shuford, 336 So.2d 1257 (Fla. 1st DCA 1976). On the record before us, jury issues are present.
Reversed and remanded for further proceedings.
JORGENSON, Judge, dissenting.
I respectfully dissent.
In my view, the entry of summary judgment in favor of Arrow Air was proper. "[I]n order for an employer's action to constitute an intentional tort, the employer must either exhibit a deliberate intent to injure or engage in conduct which is substantially certain to result in injury or death. This standard requires more than a strong probability of injury. It requires virtual certainty." Lawton v. Alpine Engineered Prods., Inc., 498 So.2d 879, 880 (Fla. 1986) (citations omitted; emphasis added). The complaint filed by the personal representative alleged gross negligence and further alleged that Arrow Air had engaged in conduct so outrageous that it amounted to an intentional tort. As Judge Ferguson correctly points out in his well-reasoned and cogent opinion, the record is replete with evidence of Arrow Air's flagrant violations of air safety regulations and lax maintenance and repair practices. As a matter of law, however, I believe that the facts adduced in discovery do not give rise to a finding that Arrow Air's conduct was virtually certain to result in death or injury.
On the authority of Lawton, I would hold that the action is barred by the exclusivity provisions of Florida's worker's compensation statute and affirm the order on appeal.
NOTES
[1] Fisher v. Shenandoah Gen. Constr. Co. and Spivey v. Battaglia, infra. See also Lawton v. Alpine Engineered Prod., Inc., 498 So.2d 879 (Fla. 1986).