927 So.2d 922 (2006)
Rodolfo CASAS, Appellant,
v.
SIEMENS ENERGY & AUTOMATION, INC., Appellee.
No. 3D04-742.
District Court of Appeal of Florida, Third District.
February 22, 2006.
Rehearing Denied May 17, 2006.
*923 Donna B. Michelson; Philip D. Parrish, Miami, for appellant.
Ruden, McClosky, Smith, Schuster & Russell and John H. Pelzer and Brigid F. Cech (Ft. Lauderdale), for appellee.
Before COPE, C.J., and RAMIREZ, and WELLS, JJ.
WELLS, Judge.
Rodolfo Casas appeals from an adverse summary judgment in an action against his employer premised on the intentional tort exception to worker's compensation immunity. Because Casas' claim does not come within this exception, we affirm.
In April 2000, Rodolfo Casas began working for Siemens Energy and Automation, Inc. at its manufacturing facility located in Miami. Casas was hired as a machine set-up operator for the operation of a mechanical punch press machine designed for stamping metal lids. His duties as a set-up operator included both setting up the punch press for operation and actually operating it. In particular, Casas worked primarily with a press commonly referred to as machine 409.
*924 Machine 409 was operated by using either a set of dual hand controls or a foot pedal. Should a metal lid become stuck in the machine, Casas was instructed to remove the obstruction with a long metal rod, or with a long screwdriver, which could be inserted into the machine through a hole in the machine's point of operation Plexiglas barrier guard. Under no circumstances was he to place his hands or arms within the punch area of the machine unless the machine had been turned off.
On September 1, 2000, Casas' arm was accidentally crushed when he stuck it, and the tool he was allegedly holding, into the machine in order to dislodge a stuck metal lid. At the time of the accident, the Plexiglas guards were not in place and the machine had not been shut off. The parties agree that the accident likely happened when Casas stepped on the machine's foot pedal while his arm was inside the machine.
Casas received worker's compensation for his injury. Thereafter, he filed a complaint against Siemens, alleging an intentional tort under the "substantial certainty of injury" exception to worker's compensation immunity. On December 3, 2003, Siemens moved for summary judgment, arguing that this exception to worker's compensation immunity did not apply. On March 5, 2004, the trial court entered summary judgment in favor of Siemens. This appeal ensued.
Florida's worker's compensation law, codified in chapter 440 of the Florida Statutes, provides a "no-fault system," under which "the employee gives up a right to a common-law action for negligence in exchange for strict liability and the rapid recovery of benefits." Turner v. PCR, Inc., 754 So.2d 683, 686 (Fla.2000). This statutory scheme provides immunity to covered employers from common-law negligence suits while providing employees with benefits on a no-fault basis. Id.
"Notwithstanding the general recognition of tort immunity for employers, the [Florida Supreme Court] has recognized an intentional tort exception to the worker's compensation statutory scheme." Id. Under the intentional tort exception, an employee must show that the employer "either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Id. at 687 (quoting Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla.1986)).
Whether conduct is substantially certain to cause injury or death is determined by applying an objective standard, that is, by determining whether a reasonable person would understand that the employer should have known that its conduct was substantially certain to result in injury or death to the employee.[1]Id. at 688-89; *925 Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 782-83 (Fla.2004). Under this standard, the employee must also demonstrate that the employer engaged in conduct more egregious than that needed to establish gross negligence. Turner, 754 So.2d at 687 n. 4.
As we noted in Bakerman, 891 So.2d at 557 (quoting Turner, 754 So.2d at 691), cases finding liability under the substantial certainty test, "contain `a common thread of evidence that the employer tried to cover up the danger [to its employees], affording the employees no means to make a reasonable decision as to their actions.'"[2] In Turner, for example, the Florida Supreme Court reversed a summary judgment in an employer's favor because the employer knew of the dangerous nature of the work being performed yet failed to disclose this danger to its employees who were unaware of the risk.[3] Similarly, two cases identified by the Florida Supreme Court in Turner as having applied the substantial certainty test, Connelly v. Arrow Air, Inc., 568 So.2d 448 (Fla. 3d DCA 1990), and Cunningham v. Anchor Hocking Corp., 558 So.2d 93 (Fla. 1st DCA 1990), also involved concealment of a risk known by the employer, but not by the employee. Connelly involved an employer which routinely overloaded and poorly maintained its aircraft and then withheld information regarding these defects and hazards from the employees flying the aircraft. Cunningham involved an employer which hid the toxic nature of the substances with which its employees worked by removing warning labels from toxic substance containers and by misrepresenting *926 the toxic nature of these substances.
Likewise, in Sierra v. Associated Marine Inst., Inc., 850 So.2d 582 (Fla. 2d DCA 2003), the Second District found a substantial certainty of injury or death where an employer failed to disclose a danger known to it but not to the employee. In that case, a new counselor at a boot camp for juvenile offenders was assigned alone to oversee a group of youths working with machetes and pickaxes at a secluded, off-campus location. The counselor, who was killed when attacked by the youths he was overseeing, was not advised that they had been assessed as flight risks, or that one of the youths had recently made violent threats to the life of the other.
By contrast, in Tinoco v. Resol, Inc., 783 So.2d 309 (Fla. 3d DCA 2001), a case involving no cover up or deception, this court concluded that while the circumstances demonstrated negligence, and perhaps even gross negligence, the employer's actions did not rise to the level of an intentional tort. In Tinoco, a pipe fitter's foot was injured when an excavating machine being used to dig a pipe trench lurched forward crushing his foot. Although the excavating machine that caused the injury was new, it was defective and lurched forward two or three feet every time the operator sought to move it. The job foreman and the crew knew of the defect, but continued to operate the machine keeping everyone away from the front of the machine during operation. The machine had been operated twenty-six or twenty-seven times without incident before the pipe fitter stepped into the operator's blind spot in front of the machine and was injured. Based on these facts, we affirmed summary judgment in the employer's favor, concluding that the facts did not demonstrate either an intent to injure or conduct substantially certain to result in injury.
The Second District also refused to find a substantial certainty of injury or death in Fleetwood Homes of Fla., Inc. v. Reeves, 833 So.2d 857 (Fla. 2d DCA 2002), quashed on other grounds, 889 So.2d 812 (Fla.2004), another case in which the element of deceit was lacking. In that case, an employee was killed when a roll of metal fell from a forklift onto the employee's head. The employee's work station was adjacent to an aisle trafficked by forklifts carrying heavy metal loads. The lift operators had been instructed by the employer to continue moving down the aisle, even when other employees did not move out of the way after the operator honked his horn. As the forklift passed the employee's work station, the metal rolls the lift was carrying struck a pipe and one roll fell off killing the employee. The Second District rejected the notion that engaging in known risks over a period of time establishes a "likelihood of injury to some employee sometime was substantially certain. If that were the case, then many injuries that occur while roofing or while performing any other moderately dangerous, repetitive job would be classified as the result of intentional torts." Id. at 869.
More recently, the Fourth District in Allstates Fireproofing, Inc. v. Garcia, 876 So.2d 1222, 1226 (Fla. 4th DCA 2004), declined to find a substantial certainty of injury or death for similar reasons, where the employee was killed when a scaffold he was working under fell on him:
We find the facts at issue here are more analogous to Fleetwood, Pacheco [v. Fla. Power & Light Co., 784 So.2d 1159 (Fla. 3d DCA 2001)], and Tinoco and less like Turner, Connelly, and Cunningham. That is to say, Allstates did not attempt to conceal, or fail to warn, the decedent of the danger involved with scaffolds. The material facts show that Allstates provided a *927 safety manual and an abundance of safety training. Moreover, it should have been obvious to the decedent that there was a danger of the scaffold tipping over and landing on him, and that this danger was more likely if someone was atop the scaffold or if the scaffold's path of movement was not clean and clear. As such, Allstates did not prevent the decedent from making an informed decision on whether or not to expose himself to the risk. Furthermore, as stated in Fleetwood, Garcia cannot add together all of the small risks of injury created by Allstates' conduct "in order to reach a combined total where the likelihood of injury to some employee sometime was substantially certain." 833 So.2d at 869. Consequently, the facts of this case do not rise to the level of an intentional tort to qualify as an exception under Turner, 754 So.2d at 686.
The element of cover up, deception or concealment of a known danger that is prevalent in the aforementioned cases is missing here. Rather, as in Bakerman and Allstates, the dangerous condition was open and obvious to Casas. And, as noted in Fleetwood, the injuries incurred while performing a moderately dangerous, repetitive job should not be classified as intentional torts.
Moreover, we disagree with appellant's argument that reversal is mandated by the Florida Supreme Court's statement in Turner, issued in 2000, that it was receding from its earlier decision in Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), "to the extent [that Lawton] could be read as rejecting the facts as stated therein as sufficient basis to support an allegation of substantial certainty of injury." Turner, 754 So.2d at 691 n. 8 (emphasis added).
Lawton sought to recover on allegations that his employer had affirmatively removed the operation guards to its press despite the manufacturer's repeated warnings, and had then failed to warn its press operators of the dangers of operating the press as altered. Unlike Lawton, however, there is no allegation here that Siemens both removed safety devices and then failed to warn or hid the risks inherent in such acts. Rather, Casas alleged that he had been inadequately trained; that the machine press with which he worked was inherently dangerous, often malfunctioned and was in need of safety upgrades; and that his employer had "actual knowledge that the press did not have any point of operation guards in place for its safe usage." We find that these allegations are refuted by the record and/or are legally insufficient on the particular circumstances of this case.
First, as to the allegation that he had not been adequately trained, the record clearly shows that Casas, like the other punch press operators, had received one-on-one, on the job training with an experienced press operator for three months before he was allowed to operate machine 409 by himself. The record also demonstrates that Casas then operated the punch press for an additional four months without incident. Shortly before his injury, Casas was disciplined for leaving a tool inside the machine, to which he admitted being careless. At that time, Casas was offered additional training by his supervisor, but he refused, assuring his supervisors that he was "well-trained" to operate the press.
Second, there is no disputing Casas' allegation that machine 409, a 150-ton punch press, was inherently dangerous or that it, like any other machine, malfunctioned from time to time and was in need of *928 safety upgrades.[4] Nevertheless, the record shows that this machine had been in operation since 1966, during which time various punch press operators had operated the machine for sixteen hours a day (two eight-hour shifts), without incident or injury, for at least ten years before Casas was injured. In fact, the record confirms that no one had sustained a serious crushing injury in any of the twenty or so other presses operated at this plant for at least twenty years before Casas was injured.[5]
Moreover, each and every witness to testify, including Casas, confirmed that it was a strict rule that employees were never to put their hands or body parts into the presses while they were turned on.[6] Hence, notwithstanding Casas' testimony that his supervisor told him that it was unnecessary to turn the power off when removing a stuck metal lid from within machine 409 with the aid of a long tool, there was no evidence that Siemens did anything to hide the dangers associated with this action or to prevent Casas from making an informed decision on whether or not to expose himself to the risk, as did the employer in Lawton.
Third, the record completely contradicts Casas' allegation that his employer had "actual knowledge that the press did not have any point of operation guards in place for its safe usage." Indeed, the uncontradicted evidence was that machine 409 was equipped with two one-half inch thick Plexiglas guards at its front and left sides and metal guards on the machine's right side where the metal feeder was located. There were no guards on the backside of the press, which could be accessed only by crawling under it. These guards, again the uncontradicted evidence shows, are point of operation guards, which comply with Occupational Safety and Health Administration (OSHA) requirements,[7] and *929 had been in place on this machine for over ten years. See 29 CFR § 1910.217(c)(2)(f)(iii)(approving for use as point of operation guards a "fixed barrier guard"). Other than for the purpose of changing the die, at which time the press was supposed to be completely turned off, operators were not permitted to operate this press without the Plexiglas guards in place. Significantly, both a supervisor at the plant where Casas worked and the employee who worked next to Casas (and who operated this press for ten years before he trained Casas to run it) testified that they had never seen machine 409 operate without the plastic guards in place, and, if the supervisor had seen it operating without the guards in place, he would have shut it off. Yet, for reasons unknown to the employer, the Plexiglas guards were not in place when Casas was injured.[8]
Casas also fails to point to any evidence to support his claim that Siemens "knew that Machine 409 did not have point-of-operation guarding, which exposed its employees to serious injury." The testimony of John Samilian, a plant manager hired by Siemens to up-grade its safety equipment, does not support this assertion as Casas suggests. Samilian, who as Casas concedes, had "no familiarity with OSHA requirements for machine guarding," testified only generally that Siemens' presses did not have OSHA conforming guards. He did not testify that machine 409 had no OSHA compliant guards. And Siemens' interrogatory admission that "[t]here were no point of operation guards on the subject power press at the time of the accident," proves only that no guards were in place at the moment of Casas' injury, not that no guards existed at all.[9] Not even Casas' expert, who reviewed all of the discovery taken in this case, opined that machine 409 had no OSHA compliant point of operation guards.
The uncontradicted evidence was that machine 409 had OSHA compliant point of operation guards which were supposed to be, but were not, on the machine at the moment Casas was injured. While Casas may or may not have known of Siemens' plans to up-grade the point of operation guards on its machines from Plexiglas barriers to light barriers with automatic shut *930 offs, Siemens neither concealed the dangers involved with working on this openly dangerous machine, nor somehow prevented Casas from making an informed decision on whether or not to expose himself to the risk of operating this machine without its existing OHSA compliant point of operation guards.[10]
Nothing in Casas' deposition contradicts this conclusion as the dissent suggests. Casas' characterization of his on-the-job training, during which he states he operated the machine by himself "[p]ractically since the first day," and as "short" rather than "extensive" as Siemens claimed, does not support the dissent's suggestion that he had not been instructed in the dangers of operating this machine. No matter how it is characterized, the training, which was not described by Casas but by the experienced supervisor who conducted it, consisted of the following:
Q. What was the first thing that you did with Mr. Casas?
A. First I started training him for the setup showing him all of the safety equipment and how to operate the machine.
. . . .
Q. Why did you show him that first?
A. To train him first I had to show him the safety of the machine and show him how to use it.
. . . .
Q. In other words, were you the operator that was, in addition to showing Casas what to do, the person that was operating the press?
A. I was operating that machine . . . .
. . . .
Q. And did he stand with you and watch you do the job?
A. Yes.
Q. For how many hours or how many days did he do that?
A. I don't remember the exact time but the training lasted like three months.
. . . .
Q. And how long did you work with him on a daily basis training him?
A. About three months.
. . . .
Q. How far into the training was it before Casas started to serve as the machine operator by himself?
A. I don't know exactly but like one month, one month and a half.
. . . .
Q. Before when I asked you about when Mr. Casas started operating the machine I thought you said a month and a half.
A. Yes.
Q. Did he start actually doing operations on the machine earlier than that?
A. We would do it together.
Q. By "together" you mean you would stand with him?
A. Yes. Teaching him.
. . . .
Q. By the end of a month and a half was he working on the machine by himself?
A. No.
. . . .
Q. And when did you consider Mr. Casas done with his training?
A. I believe like three to four months that we saw good progress in him.
The implication left by the dissent that this months' long, hands-on, on-the-job *931 training is somehow inadequate, is wholly unsupported by the record. There is no testimony whatsoever that any other training method was recommended, necessary or appropriate or that written materials were essential or necessary in learning how to operate this machine. There also is no evidence that any special education, knowledge, training or skill is necessary to operate this machine. In fact, the record shows that operation of this machine was extraordinarily simple: metal was fed into the machine at one end, and the top part of the machine, the ramp, came down with great force onto the bottom of the ramp onto which a die was affixed, stamping out a metal part which was then ejected from the machine. Whether characterized as extensive or short, there is no evidence that the three months of hands-on, on-the-job training that he received was in any manner inadequate to instruct Casas "about the various dangers involved in operating the press," the standard that the dissent claims must be met. See Turner, 754 So.2d at 691 n. 8.
The dissent also mischaracterizes Casas' testimony when it concludes that Casas "had been told it was unnecessary to turn the power off before reaching into the machine to clear a jam," and that "he had been taught that it was safe to clear a jam by extending one's hand into the working area of the machine without turning off the power." (Emphasis added). Casas confirmed only that he had been told it was unnecessary to de-power the machine to clear a jam by inserting a long metal rod or screwdriver into the machine. This is not only correct but consistent with all other testimony that machine 409 was equipped with Plexiglas barriers which have small holes in them through which a five foot long metal rod or screwdriver  but not one's hands  may be inserted to clear a jam. When using this method, it is not necessary to de-power the machine. Thus, Casas was correct when he testified in his deposition, as quoted by the dissent, that it was not necessary to turn the machines off to clear a jam and that "a supervisor would say that it was not necessary to turn off the machine."
That does not mean that the machine did not have to be de-powered when the barriers were removed to either clear a jam or to change the die. Casas knew this and did not testify otherwise:
Q. When the machine would get stuck at times because there would be a piece of material in there, who would fix that?
A. When the piece would get stuck, we have a rod and we take the piece out with the rod and when you can't with the rod, you use a screwdriver to give it more pressure to take the part out.
Q. Were you taught the proper and safe way of taking a part out of the machine when it got stuck?
A. Guillermo [Marin (the supervisor who trained Casas)] would tell me how to do it and I would do it in several occasions. Initially, he would do it and then after that, it was my turn to do it.
Q. So you were taught the safe and proper way to do it?
. . . .
A. Yes. Well, how to do it, yes.
Q. Describe to me the safe and proper procedure to remove a stuck part of a piece that gets stuck in the machine, walk me through what you would do to fix that situation?
A. Take the rod and find a way of removing it so that it can be thrown out, that's all, that's what I was taught.
Q. Would you shut the machine down first?
A. That, I was not taught because it was a matter of something that was simple to take it out.

*932 . . . .
Q. Don't you think it would be good, common sense to turn that switch off and turn the machine off if something got stuck in the machine and you have to fix it?
A. Yes.
Q. Did you ever do that?
A. No, because a supervisor would say that it was not necessary to turn off the machine.
. . . .
Q. Were you taught that if something got stuck in the machine and you had to take it out, that you should always use a rod or a screwdriver and never put your hands into it?
A. Yes.
Q. Why would you use a rod or a screwdriver and not your hands?
A. To be able to take the part out because there's no way of taking out the part with your hand.
Q. It could also be dangerous to put your hand in that situation, correct?
A. Exactly.
Q. That's common sense?
A. Yes.
(Emphasis added).
With all due respect to the dissent, Casas does not once state or suggest that he was taught that it was safe to clear a jam with one's hand without de-powering the machine. There is, therefore, no evidence that the "supervisor who instructed" him "misled him about the risk." The Turner "test" simply was not met.
Under the circumstances, we agree with the trial court that the evidence was legally insufficient to support liability under the intentional tort exception. Accordingly, we affirm.
RAMIREZ, J., concurs.
COPE, C.J. (dissenting).
Respectfully, I believe the majority opinion reads the record in favor of the wrong party. We should reverse the judgment on authority of Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), as modified by Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000).
As stated in the majority opinion, plaintiff-appellant Rodolfo Casas was a machine set-up operator for the operation of a mechanical punch press machine which stamped metal lids. His duties included setting up the machine for operation and actually operating it.
The plaintiff had been instructed that if a metal lid became stuck in the machine, the plaintiff should remove it with a long metal rod or with a long screwdriver. While attempting to clear a stuck metal lid, the machine cycled and crushed the plaintiff's arm.
The plaintiff sued defendant-appellee Siemens Energy & Automation, Inc., the owner of the manufacturing plant. The plaintiff invoked the intentional tort exception to workers' compensation immunity. Under that exception, "in order to prove an intentional tort, the employer must be shown to have either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Turner, 754 So.2d at 687 (citation omitted).
In my view, reversal is required on account of the Lawton case, which is similar to the present case. The facts of Lawton were:
Alpine Engineered Products purchased a punch press from Federal Press Company in 1972. In 1981 Carl Lawton, a punch press operator employed by Alpine, caught his hand in the press when a co-worker accidentally put *933 the press into operation as Lawton attempted to adjust the machine. The press crushed Lawton's hand and caused the loss of all the fingers on that hand. Following the accident, Lawton applied for and received workers' compensation benefits from Alpine's insurance carrier and filed suit against Federal Press Company. During the course of discovery, Lawton learned that between February 1972 and August 1980 Alpine had received numerous written communications from Federal Press informing Alpine that, for safety reasons, point of operation guards should be provided on the press and that operators should be instructed about the various dangers involved in operating the press.
498 So.2d at 880 (emphasis added). The Florida Supreme Court has stated that the foregoing facts were sufficient to support an allegation of substantial certainty of injury. Turner, 754 So.2d at 691 n. 8.
In the present case, the defendant's plant manager, John Samilian, testified that the plaintiff was given extensive training on how to operate the press at issue here, Machine 409. Deposition of John Samilian ("Samilian Deposition"), Oct. 15, 2002, at 122. Machine 409 had a Plexiglas guard which was designed to prevent an operator from placing his hand in the working area of the machine. According to the manager, the plaintiff was instructed to clear a jam by using a metal rod which could be inserted in a small opening in the Plexiglas guard. If that was not successful in clearing the jam, then the operator was to turn off the electrical power and insert a metal dowel which would prevent the press from descending. When that had been done it was permissible for the operator to bypass the Plexiglas guard and clear the jam by hand. The defense claims, and the majority opinion accepts, the proposition that the plaintiff "received one-on-one, on the job training with an experienced press operator before he was allowed to operate machine 409 by himself." Majority opinion at 11.
We are, however, obligated to read the record in the light most favorable to the plaintiff as the nonmoving party. See St. Joe Corp. v. McIver, 875 So.2d 375, 377 (Fla.2004). The plaintiff in this case denied that he had received extensive training on this machine prior to beginning to operate it. Deposition of Rodolfo Casas ("Plaintiff's Deposition"), Dec. 12, 2002, at 20-23. He stated that he had short intervals of training by a coworker. Id. He began operating the machine by himself "[p]ractically since the first day." Id. at 23. He was given no written materials, id., and simply received on-the-job training. While the plant manager testified about the company's training procedures, the plant manager acknowledged that training was handled by the supervisors and group leaders and was not handled by the manager personally. Samilian Deposition at 127.
On the day of the accident, the Plexiglas guard was not on the machine. Under the defendant's procedures, a set-up operator like the plaintiff was allowed to remove the Plexiglas guard. The defendant maintains that the plaintiff removed the Plexiglas guard himself, while the plaintiff apparently denies this. See R. 977.[11] It is, however, immaterial who removed the Plexiglas guard.
The plaintiff testified that he had been told it was unnecessary to turn the power off before reaching into the machine to clear a jam. The plaintiff testified in part:

*934 Q. Well, is there a way to completely shut the machine down either by turning off the electricity or turning off an on or off switch or unplugging it?
A. Yes, there is a switch that you would turn everything off completely.
Q. Where is that switch located?
A. At one side of the machine.
Q. Don't you think it would be good, common sense to turn that switch off and turn the machine off if something got stuck in the machines and you have to fix it?
A. Yes.
Q. Did you ever do that?
A. No, because a supervisor would say that it was not necessary to turn off the machine.
Plaintiff's deposition at 38-39 (emphasis added).
Again:
Q. But you certainly knew from common sense before this accident that you should never put your hands in the zone of danger under the ramp?
A. Supposedly, if I am not touching the controls, the machine has no reason to go down or up.
Id. at 55. The plaintiff's understanding was: "Well, supposedly if one is not using the controls, the machine remains off." Id. at 37.
In the Lawton case, the press did not have point of operation guards and the operators had not been instructed on the various dangers involved in operating the press. 498 So.2d at 880. The situation is similar here. Machine 409 had a Plexiglas guard, but it had been removed. The real problem here is that by the plaintiff's account, the supervisor had told him that it was permissible to leave the electrical power on while clearing a jam. The plaintiff had the impression that it would be impossible for the machine to cycle so long as he stayed away from the controls.
At the time of the accident the plaintiff was operating the machine using the foot controls rather than the hand controls. The plaintiff denied that he stepped on the foot controls and testified that the machine inexplicably cycled when he dislodged a stuck metal part by reaching into the machine using a foot-long screwdriver. The machine descended and caught his hand in the press. The plaintiff testified that there had been electrical problems with the machine and believed that was the cause of the accident. The defendant tested the machine after the accident and reported that the machine controls were operating normally.
At the summary judgment hearing plaintiff's counsel acknowledged that it appeared the plaintiff had become distracted while attempting to clear the jam and inadvertently stepped on the foot pedal. Because of the concession at the summary judgment hearing below, I accept the proposition that the plaintiff inadvertently stepped on the foot pedal.
The point of requiring safety devices and proper training is to prevent inadvertent injury while operating dangerous equipment. It is obvious that the press involved in this case presents the opportunity for serious injury, whether through distraction, fatigue, or operator error. Safety devices are required precisely because human beings are fallible. As the defendant's corporate director of safety testified in deposition, with these machines there are no second chances. Deposition of Walter Hazelwood, Feb. 19, 2003, at 110.
The defendant may have had an excellent training program on paper, but the plaintiff's testimony  which we must accept as true for present purposeswas that the reality fell far short of what was *935 described in the defendant's depositions. The plaintiff's testimony was that he had been taught that it was safe to clear a jam by extending one's hand into the working area of the machine without turning off the power. The supervisor who instructed the plaintiff had misled him about the risk. That testimony would, if believed by the jury, satisfy the substantial certainty test. See Turner v. PCR, Inc., 754 So.2d at 691 n. 8; Lawton v. Alpine Engineered Products, Inc., 498 So.2d at 880.
The majority opinion relies on Bombay Company, Inc. v. Bakerman, 891 So.2d 555 (Fla. 3d DCA 2004), review granted, 903 So.2d 189 (Fla.2005), but that opinion is not applicable here. In Bombay the piece of equipment at issue was a conventional wooden ladder, and this court concluded that the risk of injury from using the ladder was obvious. 891 So.2d at 557. In the present case, as in Lawton, the hazard was much greater and, by the plaintiff's account, he was misled regarding the risk.[12]
Reversal is in order.
NOTES
[1] In 2003, the Legislature codified this court-created intentional tort exception to the worker's compensation law, but in doing so, adopted a stricter "virtual-certainty standard" thereby modifying the standard announced in Turner. See Travelers, 889 So.2d at 784, n. 5 (citing ch.2003-412, § 14, at 3890-91, Laws of Fla.). Under this provision, which became effective October 1, 2003, an injured employee can satisfy the intentional tort exception and thereby avoid the exclusive remedy provisions of the worker's compensation law, "by proving by clear and convincing evidence that his employer `deliberately intended to injure him' or that his employer engaged in conduct that the employer knew, based on prior similar incidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee, and the employee was not aware of the risk because the danger was not apparent and the employer deliberately concealed or misrepresented the danger so as to prevent the employee from exercising informed judgment about whether to perform the work." Id. (quoting § 440.11(1)(b)(2), Fla. Stat. (2003)).

Because the incident in this case occurred in 2000, the 2003 amendment, with its stricter standard, does not apply. See The Bombay Co., Inc. v. Bakerman, 891 So.2d 555, 556 n. 1 (Fla. 3d DCA 2004) (confirming that the 2003 amendment to section 440.11(1)(b)(2) does not apply to events which precede that amendment), review granted, 903 So.2d 189 (Fla.2005).
[2] Finding no concealment and that the dangerous condition was evident to the employee, we concluded in Bakerman that the evidence was legally insufficient to support liability under the intentional tort exception to worker's compensation immunity. Bakerman involved an employee injured in a fall from a ladder used for retrieving merchandise from a storeroom. "The ladder was in bad condition and swayed from side to side when someone climbed it. To reach merchandise on the upper shelves, it was necessary to stand on the top step of the ladder." Bakerman, 891 So.2d at 556. Both the employee and the store manager had complained to the area supervisor that the ladder was too short and dangerous. Despite these complaints, the supervisor refused to replace the ladder.

The jury found that the employer had engaged in conduct substantially certain to result in injury or death. The trial court refused to set the verdict aside. We reversed and remanded for entry of summary judgment in the employer's favor. Id. at 55-57.
[3] In Turner, one employee had been killed and one injured in a chemical plant explosion. The complaint alleged that the employer "failed to protect its employees from a known danger of explosion and instead . . . engaged in conscious and intentional conduct which was substantially certain to result in injury or death"; "designed an extremely dangerous system . . . which it knew exceeded its capacity"; and, "despite such knowledge, the defendant intentionally concealed from its employees these dangers." Turner, 754 So.2d at 689-90, n. 7. It also alleged that the employer "did not make safety equipment available, provided inadequate safety equipment to its employees, failed to instruct its employees on appropriate and proper safety procedures, and intentionally subjected the plaintiff to a known dangerous condition which was substantially certain to result in injury or death." Id. Additionally, the affidavits filed in opposition to the employer's motion for summary judgment attested to "`at least three' other uncontrolled explosions . . . in just under two years," thereby supporting the allegations regarding the employer's knowledge that its conduct was substantially certain to result in injury or death. Id. at 690.
[4] The record shows that whenever one of these presses malfunctioned, the operator was to immediately shut it off and report it to maintenance. The press then remained tagged and unpowered until fixed by the maintenance personnel at the plant.
[5] The only evidence of any other press injury comes from a worker's compensation report which states that, in October 1999, an employee's finger was lacerated by a brake press and that the employee received "first aid" at a local hospital. The report also states that the employee lost no time from work, confirming that the injury was minor.
[6] Although "set-up" operators, such as Casas, were permitted to reach into the press to change dies, they were taught to do so only after power to the presses had been turned off.
[7] The uncontradicted testimony was:

Q. At the time you saw this press, did it have any interlock guards on it or did it have any light curtains, anything of that nature?
A. I don't remember anything but the barrier guards.
Q. And this was these three [Plexiglas] barrier guards?
A. Yes, ma'am.
. . . .
Q. What are the methods of point of operation guarding that are permitted by OSHA on power presses?
A. Barrier guards; light curtains, gates, mechanical pullbacks, or a combination of distance of the controls from the point of operation.
. . . .
Q. Okay. I am looking under C, Subsection 2 where I believe it references the point of operation guards as OSHA describes them. Would those be a die enclosed guard, a fixed barrier guard or an interlocked press barrier guard?
A. Could be all of the above.
. . . .
A. Light curtain is just another way of preventing entry into that area. Could be a barrier guard. Could be a gate. A light curtain is a lot more flexible as far as the operator is concerned and easier to perform their operations.
. . . .
Q. Now, when we were talking about the light curtain before, and I forgot the exact terminology you used, but you indicated depending on the function of the machine or the practical aspects of the use of the machine, you would choose to either put a light curtain or a barrier guard. Is that right?
A. Right.
Q. Now, am I correct then that ideally at that time this type of press being used for this type of a function was supposed to have a light curtain as its safety device?
. . . .
A. No. Barrier guards are fine on that.
(Emphasis added).
When Siemens purchased this plant in 1998, all of the presses had some type of point of origin guards. However, Siemens decided to voluntarily upgrade existing safety equipment to obtain a "star award" from OSHA. To achieve this end, the plant where Casas worked was surveyed and two individuals, one of whom was a mechanical engineer, were hired to accomplish an upgrade. In late 1999, bids were solicited and, by June of 2000, quotations from three vendors (as required by Siemens' procedures) had been obtained. As required by Siemens' procedures, the Miami plant then submitted a formal request to the Atlanta office for funds to pay for these safety-related upgrades. Although the request was ultimately approved and the upgrades made to all of the presses, machine 409 had not been upgraded at the time of Casas' injury.
[8] While the record confirms that the front Plexiglas guard was not affixed to the press at the time of Casas' injury, there is no evidence as to who removed the guard or when it was removed.
[9] The evidence was that following Casas' injury, the guards were found on the ground at the base of the machine.
[10] The record in this case, unlike that in EAC USA, Inc. v. Kawa, 805 So.2d 1 (Fla. 2d DCA 2001), does not show that the employer instructed its employees to engage in known dangerous practices.
[11] This question was not covered in the Plaintiff's Deposition. At the summary judgment hearing, the plaintiff's counsel stated that the plaintiff denied removing the guard. R. 977.
[12] Respectfully, the major flaw in the majority opinion is highlighted on page seventeen where the majority says, "No matter how it is characterized, the training, which was not described by Casas but by the experienced supervisor who conducted it, consisted of the following [quoting supervisor's deposition]." The problem is that the supervisor's description of the training he says he conducted is squarely contradicted by the plaintiff's deposition stating the training he received. The majority opinion accepts the supervisor's testimony as being true. But under summary judgment standards, we must accept the plaintiff's testimony as being true. "Upon review of the entry of a summary judgment, an appellate court must review the record and any supporting affidavits in the light most favorable to the non-moving party." Turner v. PCR, Inc., 754 So.2d at 684 (Fla.2000) (citation omitted). This means that the factual conflicts must be resolved in favor of the plaintiff as the non-moving party, and all reasonable factual inferences, must be viewed in the light most favorable to the plaintiff. See Martinez v. Fla. Power & Light Co., 863 So.2d 1204, 1205 (Fla.2003); Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966). That being so, we must accept as true the plaintiff's testimony that he was set to work on this machine with relatively little training and with what turned out to be a tragically inadequate understanding of how the machine works.