929 So.2d 552 (2006)
Amanda BOURASSA, Appellant,
v.
BUSCH ENTERTAINMENT CORP., d/b/a Busch Gardens, Appellee.
No. 2D05-2018.
District Court of Appeal of Florida, Second District.
April 7, 2006.
Rehearing Denied June 2, 2006.
*554 Joel D. Eaton of Podhurst Orseck, P.A., Miami; and John McLaughlin of Wagner, Vaughn & McLaughlin, P.A., Tampa, for Appellant.
Elliot H. Scherker and Daniel M. Samson of Greenberg Traurig, P.A., Miami; and Barry Richard of Greenberg Traurig, P.A., Tallahassee, for Appellee.
STRINGER, Judge.
Amanda Bourassa seeks review of the final summary judgment entered in favor of Busch Entertainment Corporation d/b/a Busch Gardens in this personal injury action. Because the undisputed facts show that the intentional tort exception to workers' compensation immunity does not apply, we affirm.

FACTS
While the parties dispute some of the facts surrounding how the accident occurred, the facts relevant to the summary judgment issues are essentially undisputed. Busch Gardens owns a full-grown male lion named Max. Max suffers from a liver disorder that requires him to undergo periodic blood tests. For a number of years, Busch Gardens' keepers would anesthetize Max when they needed to draw blood; however, because of health concerns about Max and safety concerns about the keepers during this process, Busch Gardens ultimately sought a different way to perform this procedure.
In 1998, at the suggestion of one of its veterinarians, Busch Gardens began using positive reinforcement operant conditioning to train Max to enter a narrow cage and lie down so blood could be drawn from his tail. As part of the operant conditioning, Max was rewarded with food when he remained calm during each step of the procedure. While one keeper operated the cage gates and two others performed the blood draw, a fourth keeper would sit outside the cage by Max's head and provide the food rewards. These food rewards consisted of either large chunks of meat or large balls of ground meat that were pushed through the bars of the cage. In order to reinforce Max's conditioning with this procedure, simulated blood draws  during which the entire procedure would be performed but no blood would actually be drawn  were performed several times a week.
Busch Gardens had a multiphase training program for all of its keepers who were going to work with carnivores throughout the park. Only certain keepers were permitted to work with Max, and those keepers were extensively trained on the blood draw procedure. This training included observing the procedure numerous times, performing each portion of the procedure numerous times under strict supervision, and oral testing on all portions of the procedure and how it was to be done properly. During this training, keepers were specifically trained on how to hold the food rewards and pass them through the cage bars so that Max would have access to the meat but not to the keeper's *555 hands or fingers. When performed correctly, the procedure did not allow for any part of Max's mouth to come into contact with any part of the keeper's body. In the four years between the time Busch Gardens implemented this blood draw procedure and the accident at issue here, the only known injury occurred when a keeper was scratched by the claw of a female lion who was being trained to have blood drawn. This injury required treatment with a band-aid.
The record shows that Bourassa had worked with animals and had been around animals long before she began working at Busch Gardens. While in high school, Bourassa had been an active member of Future Farmers of America. She had subsequently obtained an associate of science degree in animal sciences from Abraham Baldwin Agricultural College. During college, she completed a three-month internship as a keeper at the Lowry Park Zoo. During her deposition, Bourassa testified that she had learned about positive reinforcement operant conditioning while in school and had used it with various animals while she was an intern at the Lowry Park Zoo.
Bourassa began working as a keeper at Busch Gardens in the summer of 2001. She was considered a dedicated and very capable keeper by her supervisors. After Bourassa had been working at Busch Gardens for several months, she began training to perform the blood draw procedure with Max. She observed the procedure on approximately twenty occasions and participated in the procedure approximately ten times with direct supervision. After Bourassa successfully completed her training, she participated in various aspects of the blood draw procedure with Max at least five times before the day of the accident.
On the day of the accident in May 2002, Bourassa had arranged for her family to have a "behind the scenes" tour of the park. As part of this tour, Bourassa specifically requested that she be permitted to perform a simulated blood draw on Max, and she specifically requested to be the keeper who reinforced Max's good behavior with food rewards. All went well until the end of the procedure when, somehow, Max was able to grab Bourassa's fingers and pull her hand and arm into the cage. The struggle between the two did not end until Bourassa's arm was severed at the elbow.
Since the day of the accident, Bourassa has been receiving workers' compensation benefits from Busch Gardens.[1] In June 2003, Bourassa sued Busch Gardens seeking damages for her injuries. Busch Gardens raised workers' compensation immunity, pursuant to section 440.11, Florida Statutes (2002), as an affirmative defense to Bourassa's action. Bourassa in turn contended that her case fell into the "intentional tort" exception to workers' compensation immunity. After the parties conducted extensive discovery, Busch Gardens moved for summary judgment on the issue of workers' compensation immunity. The trial court granted summary judgment *556 in favor of Busch Gardens, and Bourassa appealed.

INTENTIONAL TORT EXCEPTION
Bourassa first contends that summary judgment was improper because Busch Gardens' actions fell within the intentional tort exception to workers' compensation immunity as a matter of law. Both parties correctly rely on Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), as setting forth the applicable law. In Turner, the Florida Supreme Court reaffirmed the existence of an intentional tort exception to workers' compensation immunity. Id. at 687. In doing so, the court held that the injured worker may establish an intentional tort in one of two ways. "[T]he employer must be shown to have either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Id. (quoting Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla.1986)) (alteration in original).[2] In applying the "substantial certainty of injury" test, the question is not what the specific employer knew or did not know, but rather whether a reasonable person would understand that the employer's conduct was substantially certain to result in injury or death. Turner, 754 So.2d at 688-89.
In addition, the courts have considered what level of conduct meets the "substantially certain" test. Turner noted that the conduct at issue must be worse than gross negligence. Id. at 687 n. 4. In fact, "the cases which have actually applied the Turner doctrine, especially Turner itself, have characteristically involved a degree of deliberate or willful indifference to employee safety." Pacheco v. Fla. Power & Light Co., 784 So.2d 1159, 1163 (Fla. 3d DCA 2001). Thus, while an employee need not show an actual intent to injure, the employee must show that the employer was aware of the dangers and deliberately ignored them at the expense of employee safety.
For example, in Turner, employees were injured in an explosion at a chemical plant. The evidence showed that PCR knew that some of its chemicals were prone to spontaneous and violent explosions but that it failed to warn its employees of the extent of the danger. 754 So.2d at 685. There had been three other explosions involving similar chemicals in the two years before the incident at issue. Id. Despite knowledge of the danger of the chemicals and the prior explosions, PCR management had instructed employees to mix chemicals in reactors that did not have pressure relief valves and that were not designed for use in mixing reactive chemicals. Id. The court held that these facts were sufficient to establish a willful indifference to employee safety.
Similarly, in Sierra v. Associated Marine Institutes, Inc., 850 So.2d 582 (Fla. 2d DCA 2003), AMI ran a residential juvenile detention center for the Department of Juvenile Justice. Because all of the inmates were high risk, AMI imposed strict security measures.
Staff members were required to undergo a rigorous orientation that included training in verbal and physical use of force, familiarization with policies and procedures, and "job shadowing" of experienced staffers. Until this training was completed, a new staff member was not to have direct contact with youths *557 except under the direct supervision of a certified drill instructor or camp commander.
Id. at 585. All members of the staff were to be alerted to specific developments concerning the risks posed by various inmates. Id. Further, all work projects were to be supervised by at least two trained staff members. Id.
Despite these policies and rules, when Sierra had been employed by AMI for only eight days, he was sent alone to supervise three youths on a work project, two of whom had recently been classified as escape risks. Sierra had not undergone the required training. He was not told of the risk status of the youths he was supervising. No one was assigned to accompany him. This court held that these facts were sufficient to establish the level of indifference to employee safety necessary to support an action against AMI.
Other cases that have allowed actions to go forward against employers have involved a similar level of indifference to employee safety. See, e.g., EAC USA, Inc. v. Kawa, 805 So.2d 1 (Fla. 2d DCA 2001) (holding that employer could be subject to contribution claim based on the intentional tort exception to workers' compensation immunity when there was evidence that employer had removed safety guards from printing presses; had been warned of the dangers but refused to reinstall the guards, disregarding safety notices about the machinery; and had instructed employees to engage in dangerous practices); Connelly v. Arrow Air, Inc., 568 So.2d 448 (Fla. 3d DCA 1990) (allowing case to go forward against employer that ignored known problems with its airplanes to avoid costly repairs, performed marginal maintenance on its planes, purposefully did not inform flight crews of the known problems with specific planes, and routinely overloaded planes above their carrying capacity).
Considering the law in light of the facts of this case, it is clear that the trial court properly entered summary judgment in favor of Busch Gardens for three reasons. First, Busch Gardens did not ignore evidence of prior accidents, injuries, or known safety hazards. There is no question that Max  a full-grown male lion  was an extremely dangerous animal. However, the blood draw procedure at issue had been performed several times a week for at least four years before the accident involved in this case with no prior injuries other than a scratch requiring a band-aid. Thus, unlike the situation in many of the cases relied upon by Bourassa, there is no evidence here that the employer exhibited deliberate indifference to known hazards and dangers.
Second, there is no question that Busch Gardens had a training program in place and that Bourassa was fully trained in the procedure she was to perform. Under this type of circumstance, at least one court has held that an employer is entitled to workers' compensation immunity. In Allstates Fireproofing, Inc. v. Garcia, 876 So.2d 1222 (Fla. 4th DCA 2004), the evidence showed that the employer hired Garcia as a laborer to work in and around scaffolding. Garcia had five to ten years' experience working with scaffolding; however, Allstates also provided training and instruction to Garcia in both the use and moving of scaffolding approximately fifteen to twenty times before the accident. Id. at 1223. Allstates also provided a safety manual, and Garcia had taken and passed a written safety test. Id. Despite this, on the day of the accident, Garcia improperly moved the scaffolding by pushing it sideways. Id. This caused the scaffolding to fall over, hitting Garcia in the head and ultimately killing him. Id. In reversing for *558 entry of summary judgment in Allstates' favor, the Fourth District noted that, considering the extensive safety training and procedures Allstates had in place, there was no evidence of deliberate indifference to employee safety sufficient to put Garcia's case within the exception to workers' compensation immunity.
Like Allstates did with Garcia, Busch Gardens had fully trained Bourassa before she was permitted to work with Max. Contrary to Bourassa's assertions in this appeal, the evidence does not show that she was "inexperienced" in these procedures. Rather, all of the evidence establishes that Busch Gardens had trained Bourassa on this procedure, that it supervised her work during that training period, that Bourassa was fully aware of the risks of working with Max, and that she was fully aware of how to perform the procedure to minimize those risks. As in Garcia, there is no evidence to establish that Busch Gardens exhibited deliberate indifference to employee safety.
Third, there is no evidence that Busch Gardens concealed the dangers inherent in the blood draw procedure from Bourassa or any other employee. Several Florida cases have held that when the employer has not concealed any of the risks involved in the activity and when the employee is fully aware of the risks, the intentional tort exception does not apply. See, e.g., Bombay Co. v. Bakerman, 891 So.2d 555, 557 (Fla. 3d DCA 2004) ("[T]he dangerous condition was evident to the employee and there was no concealment of the danger. For that reason, we conclude that the evidence was legally insufficient to support liability under the intentional tort exception to worker's compensation immunity."), review granted, 903 So.2d 189 (Fla.2005); Allstates, 876 So.2d at 1226 (noting that Allstates did not attempt to conceal the dangers of scaffolding and did not prevent the employee from making an informed decision whether to expose himself to the risk); Tinoco v. Resol, Inc., 783 So.2d 309 (Fla. 3d DCA 2001) (noting that the defect in the machine that injured the employee was obvious to everyone working around it and that therefore there was no evidence of deliberate indifference by the employer). These cases rely on the supreme court's statement in Turner that the cases falling into the intentional tort exception "share a common thread of evidence that the employer tried to cover up the danger, affording the employees no means to make a reasonable decision as to their actions." Turner, 754 So.2d at 691.
Here, whatever dangers existed in sitting outside of the cage by Max's head and giving him food rewards were obvious to all. Bourassa herself testified that she was fully aware of the risks and dangers. Moreover, there is no dispute that Bourassa was not required to perform this job as part of her assigned duties at Busch Gardens. Rather, the evidence showed that keepers were permitted to select what position they wanted to be in during the blood draw procedure. Thus, Bourassa had the opportunity to make a reasonable decision as to whether to expose herself to the risk. Under these circumstances, the intentional tort exception does not apply.
Bourassa relies on Gerth v. Wilson, 774 So.2d 5 (Fla. 2d DCA 2000), to argue that summary judgment was improper; however, reliance on that case is improper for two reasons. First, while Gerth briefly discussed the intentional tort exception to workers' compensation immunity, the decision was actually based on the statutory exception that applies when an employer violates the law. The question before the court was whether an OSHA violation that could result in prison time constituted a "violation of the law" as contemplated by the workers' compensation statute. Thus, *559 the brief mention of Turner and its objective standard was not vital to the opinion and does not support Bourassa's case. Second, the evidence in Gerth showed that the employer had refused to install safety guards around an open elevator shaft despite an earlier falling accident in the same improperly guarded shaft. Evidence that the employer had deliberately violated OSHA regulations despite being aware of a prior fall would have been sufficient to establish deliberate indifference to the safety of employees.
Here, there is no question that Busch Gardens did not violate the law, and there is no evidence that Busch Gardens exhibited deliberate indifference to the safety of its employees. Accordingly, the trial court properly entered summary judgment in favor of Busch Gardens.

EXPERT'S AFFIDAVIT
Bourassa also contends that summary judgment was improper because her expert's affidavit created genuine issues of material fact that would preclude entry of summary judgment in Busch Gardens' favor. We disagree.
As discussed above, the question in this case is whether Busch Gardens engaged in conduct that was substantially certain to result in injury or death. The test is not whether the death or injury was preventable. Thompson v. Coker Fuel, Inc., 659 So.2d 1128, 1129-30 (Fla. 2d DCA 1995). Thus, an employer's knowledge of the risks of dangerous activities and its failure to make the conditions "more safe" is not sufficient to establish an exception to workers' compensation immunity in the absence of some evidence of a deliberate indifference to employee safety.
For example, in Wilks v. Boston Whaler, Inc., 691 So.2d 629 (Fla. 5th DCA 1997), the evidence showed that Wilks was required to work with potentially harmful chemicals in his job as a "foamer" for Boston Whaler. Boston Whaler had an established safety program that required all employees to attend an eight-hour safety training meeting. Those employees who worked with chemicals were specifically instructed, one-on-one, as to how to operate, wear, clean, and store the respirators they were given. After Wilks began suffering respiratory illnesses, he sued Boston Whaler.
In arguing against summary judgment, Wilks offered the affidavit of an industrial hygienist, who opined that the type of respirators used by Boston Whaler were not proper and that a different type should have been used to provide fresher air to the users. The same affidavit opined that Boston Whaler should have made certain alterations to its ventilation system as well. Wilks argued that this affidavit created genuine issues of material fact concerning whether Boston Whaler engaged in conduct that was substantially certain to result in injury or death. The trial court granted summary judgment in favor of Boston Whaler, and Wilks appealed.
On appeal, the Fifth District rejected Wilks' argument that the affidavit precluded summary judgment. In doing so, the Fifth District stated:
The hygienist's report, which really forms the underlying basis for Wilks' allegations of culpable negligence or an intentional tort on the part of Boston Whaler, is little more than a series of recommendations for better health safety practices which could reduce overall employee health costs for Boston Whaler. Neither from the report, nor from any other part of the record, can it be inferred in any way that the failure to provide an air-supplied respirator, rather than a cartridge respirator, or the failure to provide Wilks a copy of the *560 Material Safety Data Sheet on TDI, constituted conduct substantially certain to result in Wilks' injury or death. The safety program that Boston Whaler had in effect during the time of Wilks' employment further belies any indication that Boston Whaler had a deliberate intent to engage in conduct which, almost with certainty, would cause injury or death to its employee.
....
... Boston Whaler may have done more to reduce the risk of injury from exposure to TDI, but doing more in terms of employing better methods to avoid worker injury, and intentionally creating a situation which is substantially certain to cause injury, is [sic] not the same.
Id. at 631-32.
Like the affidavit in Wilks, the affidavit offered by Bourassa is simply a criticism of the blood draw procedure and a series of recommendations for how Busch Gardens could make the procedure safer. Even taking the allegations in the affidavit as true, they do not rise to the level established by the case law as sufficient to establish that Busch Gardens engaged in conduct reflecting a deliberate indifference to employee safety. Accordingly, the affidavit is legally insufficient to create a genuine issue of material fact that would preclude summary judgment.
Moreover, this court has specifically rejected the argument that a party may add up the individual probabilities of an accident based on the different risks inherent in a particular job to establish that injury is substantially certain to occur for purposes of the intentional tort exception to workers' compensation immunity. In Fleetwood Homes of Florida, Inc. v. Reeves, 833 So.2d 857 (Fla. 2d DCA 2002), quashed on other grounds, Reeves v. Fleetwood Homes of Fla., Inc., 889 So.2d 812 (Fla.2004), Reeves was killed after a 600-pound roll of sheet metal fell from a forklift that had its load raised fourteen feet in the air. The evidence showed that Fleetwood had been transporting sheet metal in this fashion for some time and that no sheet metal had ever fallen from the forklifts and no injuries had ever occurred. Id. at 860. Despite this, the trial court concluded that an accident was "inevitable" because of the number of hazards involved. In rejecting this conclusion, this court stated:
The trial court concluded that this method of transport involved a level of risk to the workers and that if it were performed often enough or long enough, eventually it was "inevitable" that someone would be hurt or killed. However, any modestly dangerous activity at a workplace that is repeated often enough or long enough will eventually result in an accident. Although the concept of "gross negligence" examines the combination of circumstances to evaluate the relevant risk, it does not add together or cumulate the individual probabilities of an accident on each occasion to reach a conclusion that an accident is inevitable or that a risk is inordinately high. The tortfeasor's conduct must be evaluated in the context of the particular occurrence. In this case, if anything, the numerous successful performances of the challenged procedure show that a risk of accident on April 1, 1991, was far from imminent. This is not a case in which the employer continued to use the procedure after earlier mishaps or after it received warnings from other governmental or nongovernmental entities.
Id. at 868.
The expert affidavit presented by Bourassa lists various risks attendant in the blood draw procedure and concludes that it was "inevitable" that someone would eventually *561 be injured because of these risks. However, this is exactly the type of conclusion this court has rejected. Thus, the proffered affidavit does not raise genuine issues of material fact sufficient to preclude summary judgment in favor of Busch Gardens.

CONCLUSION
We are not unsympathetic to Ms. Bourassa and her family. There is no denying that she endured a horrific event and that she has suffered life-altering injuries. We certainly understand her desire to seek recompense over and above what she will receive in workers' compensation benefits. However, we cannot allow sympathy to blur the contours of the intentional tort exception to workers' compensation immunity. It is not the dangerousness of the job or the nature of the injuries that determine whether the exception applies. Rather, the focus is and must be on the employer's approach to its employees' safety in light of the dangers inherent in the job. Here, because the undisputed facts evidenced in the record do not establish that Busch Gardens engaged in conduct that was substantially certain to result in injury or death, the trial court properly granted summary judgment in favor of Busch Gardens on the basis of workers' compensation immunity.
Affirmed.
DAVIS, J., Concurs.
WHATLEY, J., Dissents with opinion.
WHATLEY, Dissenting.
I respectfully dissent. Amanda Bourassa filed an action against Busch Entertainment Corp., d/b/a Busch Gardens, for personal injuries she sustained while working for Busch Gardens. She appeals the final summary judgment entered in favor of Busch Gardens on its defense of workers' compensation immunity.
The question presented is whether the intentional tort exception to the tort immunity afforded employers by Florida's Workers' Compensation Law is applicable in this case. "[I]n order to prove an intentional tort, the employer must be shown to have either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" Turner v. PCR, Inc., 754 So.2d 683, 687 (Fla.2000) (quoting Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla.1986)). No one contends Busch Gardens acted with a deliberate intent to injure Bourassa. However, I would conclude that there remained a genuine issue of material fact whether the conduct of Busch Gardens was substantially certain to cause injury or death, and this case should have been submitted to a jury for resolution.
The only affidavit submitted at the summary judgment hearing was that of Bourassa's expert, Dr. Michael Schmidt. Dr. Schmidt is an expert in the field of big cats and animal behavior. He is a twenty-five-year employee of the Metro Park Zoo in Portland, Oregon, where he was employed as its chief veterinarian. He has performed blood draws on various animals, including lions, and published in excess of thirty articles on aspects of the zookeeper trade. Among other assertions, Dr. Schmidt cited inadequate training, improperly wide cage bars, hazardous lion distraction methods, and a hazardous working environment. Dr. Schmidt's affidavit centered not on matters of prevention, but rather on matters germane to summary judgment and to the objective test set forth in Turner, 754 So.2d 683. The Turner court stated: "Under an objective test for the substantial certainty standard, an analysis of the circumstances in a case *562 would be required to determine whether a reasonable person would understand that the employer's conduct was `substantially certain' to result in injury or death to the employee." Id. at 688. On summary judgment the movants' affidavits, if any, are to be strictly read, and the affidavits of the party opposing summary judgment are to be liberally read. See Holl v. Talcott, 191 So.2d 40, 46 (Fla.1966)
Other specifics of the case which could arguably cause a reasonable person to conclude that the conduct of Busch Gardens was substantially certain to cause injury or death include: (1) Bourassa was a part-time employee; (2) safety precautions during the blood draw procedure were nonexistent; a fellow worker testified that he tried to distract the lion with a broom handle, without success; (3) while working at the Lowry Park Zoo, Bourassa never hand-fed a lion, and feeding of other animals was done with a prong or bamboo stick; (4) there appears to be no other zoo or related facility which conducts blood draws in this manner; (5) the inherent risks in handfeeding a lion; (6) the prior injury during the procedure left a permanent scar; (7) Bourassa wore latex gloves during the procedure, which is significant as the tongue of a lion has rearward facing spines; and (8) the operant conditioning was initiated primarily, if not exclusively, for the benefit of the lion. Bourassa's supervisor, Lisa Harris stated the following in her deposition: "Q: But the idea behind the voluntary blood draw was so you would not have to anesthetize the animal? A: Yes, sir."
The sending of an employee into the workplace with escapees is, at a minimum, analogous to placing a part time employee at the head of a lion for the purpose of hand feeding. See Sierra v. Associated Marine Insts., Inc., 850 So.2d 582 (Fla. 2d DCA 2003) (reversing dismissal of plaintiff's action because facts, if proved, could convince a jury employer should have known there was substantial certainty that sending a new employee into woods to supervise minor felons of boot camp who were using machetes and pick-axes to fell trees would result in employee's injury or death).
I recognize that the exceptions to workers' compensation immunity are to be narrowly construed. See Bombay Co. v. Bakerman, 891 So.2d 555 (Fla. 3d DCA 2004). Yet, if this case does not present a jury question as to whether the employer's conduct was substantially certain to cause injury or death, then no case would seem to qualify.
I would reverse the entry of final summary judgment and allow the case to proceed to trial.
NOTES
[1] The pleadings reflect a factual dispute as to whether Bourassa applied for these benefits, thereby electing the remedies available to her under the workers' compensation statute and barring her right to pursue this action. See Wishart v. Laidlaw Tree Serv., Inc., 573 So.2d 183, 184 (Fla. 2d DCA 1991); Wheeled Coach Indus., Inc. v. Annulis, 852 So.2d 430, 431 (Fla. 5th DCA 2003) (noting that a plaintiff's mere acceptance of benefits paid does not necessarily demonstrate a conscious intent to elect the workers' compensation benefits and waive all other rights). While there are disputed issues of material fact on this issue, this issue was not raised in the summary judgment motion or at the hearing and was not considered by the trial court. Thus, we do not address the issue here.
[2] Section 440.11, Florida Statutes, was amended in 2003 to change the standard for proving an intentional tort to one of a "virtual certainty" of injury. Ch. 2003-412, § 14, Laws of Fla. The parties agree that this statutory change does not apply to Bourassa's accident, which occurred in 2002.