WELLS, J.
(dissenting).
I respectfully dissent. Upon consideration of Bakerman v. The Bombay Co., 961 So.2d 259 (Fla.2007), and the parties’ supplemental arguments on remand, I would again affirm entry of summary judgment in favor of Rodolfo Casas’ employer, Siemens Energy and Automation, Inc. I would do so because the pleadings and discovery demonstrate that, as a matter of law, Casas’ claim does not fall within the intentional tort exception to workers’ compensation immunity.
As the majority herein states, our original opinion in this case relied in part on this Court’s earlier decision in The Bombay Co. v. Bakerman, 891 So.2d 555 (Fla. 3d DCA 2004) (“Bakerman I”), which “effectively held concealment to be an indispensable criterion of the substantial certainty analysis of the intentional tort exception [to workers’ compensation immunity].” Bakerman v. The Bombay Co., 961 So.2d 259, 263 (Fla.2007) (“Bakerman II”). Now that the Florida Supreme Court has quashed Bakerman I, holding that this Court erred in adding concealment as an essential element to the substantial certainty test, this case has been remanded to us for reconsideration without that element. See Casas v. Siemens Energy & Automation, Inc., 969 So.2d 356 (Fla.2007) (“Casas II”).
Since our decision in Casas v. Siemens Energy & Automation, Inc., 927 So.2d 922 (Fla. 3d DCA 2006) (“Casas /”), did not *300 turn on the now discredited concealment element, I would affirm for the same reasons stated in that opinion. Moreover, after two sets of briefings and two oral arguments, there is no dispute as to the facts relevant to whether an intentional tort has been committed. More specifically, in April 2000, Rodolfo Casas was hired by Siemens to operate a mechanical punch press machine, referred to as machine 409, which made metal lids. At the time Casas was hired, this machine had been in operation for thirty-four years, during which time various punch press operators had operated it sixteen hours a day (two eight-hour shifts) without incident or injury.[4] Although this machine was scheduled for upgrades to its point of operation guards, at the time Casas was injured it was fitted with Plexiglas point of operation barriers which were OSHA compliant.[5]
The undisputed evidence was that Casas received one-on-one training with an experienced operator as to how to use machine 409. He was taught how to change the die (the part of the machine that determined which part was being made) and was instructed on how to clear a jam from the press area. He was also instructed never to put his hands or any part of his body into the press area, and if it became necessary to clear material stuck in the press, he was to use a long metal rod, or screwdriver, inserted through a hole in the machine’s point of operation Plexiglas barrier, to clear the jam.
Despite this training and instruction, on September 1, 2000, Casas’ arm was accidentally crushed when he stuck it, and the tool he was allegedly holding, into the machine in order to dislodge a stuck metal lid. At the time, the Plexiglas guards were not in place, and the machine had not been shut off. The parties agree that the accident likely happened when Casas stepped on the machine’s foot pedal while his arm was inside the machine.
Casas received workers’ compensation for this injury. He also brought suit against Siemens, seeking to avoid application of the immunity conferred by the workers’ compensation laws because Siemens had committed an intentional tort: (1) by inadequately training him; (2) by requiring him to work with an inherently dangerous machine which often malfunctioned and was in need of safety upgrades; and, (3) by failing to “have any point of operation guards in place for ... safe usage.” Siemens moved for summary judgment, arguing that the intentional tort exception to workers’ compensation immunity did not, as a matter of law, apply in this case. Summary judgment in favor of Siemens was granted.
This judgment should have been, and should now be, summarily affirmed because Casas’ claim is supported by neither the law nor the record and is, at best, a negligence claim that cannot trump workers’ compensation immunity.
Florida’s workers’ compensation law, codified in chapter 440 of the Florida Statutes, provides a “no-fault system,” under which “the employee gives up a right to a common-law action for negligence in ex *301 change for strict liability and the rapid recovery of benefits.” Turner v. PCR, Inc., 754 So.2d 683, 686 (Fla.2000). This statutory scheme provides immunity to covered employers from common-law negligence suits, while providing employees with benefits on a no-fault basis. Id.
“Notwithstanding the general recognition of tort immunity for employers, the [Florida Supreme Court] has recognized an intentional tort exception to the worker’s compensation statutory scheme.” Id. Under the intentional tort exception, an employee must show that the employer “either ‘exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.’ ” Id. at 687 (quoting Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla.1986)).[6]
Whether conduct is substantially certain to cause injury or death is determined by applying an objective standard, that is, by determining whether a reasonable person would understand that the employer should have known that its conduct was substantially certain to result in injury or death to the employee. Id. at 688-89; Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 782-83 (Fla.2004). Under this standard, the employee must also demonstrate that the employer engaged in conduct more egregious than that needed to establish gross negligence. Turner, 754 So.2d at 687 n. 4. Casas’ claims that he was not “adequately trained,” that the machine he worked on was dangerous and often malfunctioned, and that it had no safety devices do not, on the record before us, satisfy this test.
As to Casas’ training claim, there is no testimony whatsoever in this record as to what training, if any, is mandated for operators of this or any other punch press machine, and the only testimony about the actual training that Casas received came from the man who trained him. That witness testified that Casas received one-on-one training on machine 409 for a period of three months — with Casas first only observing for a month and a half, then with Casas operating the machine while the trainer observed for another month and a half, and finally with Casas operating the machine by himself.
Casas does not contradict this testimony; he simply tries to re-characterize it:
Q. Did you have any training to know how to operate this machine before you started working on the machine?
A. Very little training with a co-worker.
[[Image here]]
*302 Q. And he had more experience on the machine than you did?
A. Yes.
Q. How much time would it take to show you how to operate this machine?
A. He would show me for short whiles. Anything that I need to ask him, I would ask him but I would continue working on the machine.
Q. So you received on-the-job training?
A. Yes.
Q. Did you feel that you received adequate training in order to properly know how to work this machine?
A. Legally, no.
[[Image here]]
Q. When you began, did there come a time when after [the trainer] showed you how to operate the machine that you began operating the machine by yourself?
A. Yes.
Q. When did you start operating the machine by yourself?
A. Practically since the first day.
Q. Since April of 2000?
A. Yes.
No matter how characterized, the facts detailing the training Casas received remain unchanged: first he watched while someone else operated the machine; then he operated the machine while someone watched him; then he operated the machine alone for four months before he was injured. As for training about whether body parts should be placed in the press— other than the obvious, that is, that no part of one’s body should be placed inside a machine the function of which is to slam down on a piece of metal with such force as to mold the metal into an electrical lid cover — Casas was told: do not put your hands into the press without turning it off; otherwise, insert a metal rod or long screwdriver (provided to him) into a hole in the Plexiglas point of origin guard (yes, one did exist) to remove a jam.[7] This training and instruction, combined with the fact that no injuries had occurred for over thirty-four years during operation of machine 409 establishes that Siemens was not deliberately indifferent to known hazards and dangers making it substantially certain that employees would be injured or die and that summary judgment was properly granted.
The decision in Bourassa v. Busch Entertainment Corp., 929 So.2d 552 (Fla. 2d DCA 2006), supports this result. In Bourassa, part of a zoo employee’s arm was bitten off while feeding a lion. There, an employee performing a dangerous job had been trained (as had Casas) first by observing, then by performing under supervision, and lastly by performing alone. Specifically, in Bourassa, the employer, a private zoo, decided to use positive reinforcement to train one of its lions to permit zoo employees to draw blood from it rather than using the standard procedure of putting the lion to sleep for this purpose. To accomplish this end, zoo employees were trained to “herd” the lion from one cage into another by controlling the gates between different cages and for one employee to feed the lion through the bars of a cage while two other employees drew blood from the lion’s tail. Despite this training, one of the employees whose job it was to feed “treats” to the lion while blood was being drawn from its tail, lost her hand and part of her arm when the lion *303 grabbed her fingers and pulled her hand into the cage.
While recognizing that “a full-grown male lion [is] an extremely dangerous animal,” the Bourassa court nonetheless affirmed summary judgment in the employer’s favor. Id. at 557. It did so, in significant part, because the employer had a training program in place and because the procedure “had been performed several times a week for at least four years before the accident involved ... with no prior injuries,” thereby demonstrating that the employer “did not ignore evidence of prior accidents, injuries, or known safety hazards.” Id. The same reasoning applies here. While working on a punch press machine obviously can be dangerous, Casas’ employer had a training program in place and Casas participated in it. Moreover, before Casas was injured, machine 409 had been in continuous operation without incident sixteen hours a day, for thirty-four years. Thus, as in Bourassa, there is no evidence here that the employer exhibited deliberate indifference to known hazards and dangers or to employee safety so that it was substantially certain that injury or death would result from operation of machine 409.
The fact that machine 409 was dangerous and malfunctioned from time to time, again as precedent teaches, also provides no basis for circumventing the workers’ compensation laws. In Tinoco v. Resol, Inc., 783 So.2d 309 (Fla. 3d DCA 2001), this Court affirmed summary judgment for an employer in an action brought by an employee whose foot was crushed by an excavating machine. In that case, the job foreman and crew working with the machine knew that it was malfunctioning, lurching forward two or three feet every time the operator sought to move it, yet continued to use it until after approximately twenty or so uses, one of the workers was seriously injured. Despite the fact that the machine was dangerous and malfunctioning, this Court found no basis for avoiding workers’ compensation immunity because the facts when viewed in a light most favorable to the employee, demonstrated only negligence, not a substantial certainty of injury or death:
We concur with the trial court that the facts of this case do not show that the employer ‘exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.’ Viewed in the light most favorable to the plaintiff, the circumstances demonstrate negligence. But under the case law, a showing of negligence, or even gross negligence, is not enough.
Id. at 310-11 (citation omitted).
The same must be said here. As explained in Fleetwood Homes of Fla., Inc. v. Reeves, 833 So.2d 857, 868 (Fla. 2d DCA 2002), quashed on other grounds, 889 So.2d 812 (Fla.2004), any dangerous activity, repeated often enough eventually will result in an accident. This does not make such accidents substantially certain to happen:
[A]ny modestly dangerous activity at a workplace that is repeated often enough or long enough will eventually result in an accident. Although the concept of ‘gross negligence’ examines the combination of circumstances to evaluate the relevant risk, it does not add together or cumulate the individual probabilities of an accident on each occasion to reach a conclusion that an accident is inevitable or that a risk is inordinately high. The tortfeasor’s conduct must be evaluated in the context of the particular occurrence. In this case, if anything, the numerous successful performances of the challenged procedure show that a *304 risk of accident ... was far from imminent. This is not a case in which the employer continued to use the procedure after earlier mishaps or after receiving warnings from other governmental or nongovernmental entities.
Id. at 868, 869; see also Allstates Fireproofing, Inc. v. Garcia, 876 So.2d 1222, 1226 (Fla. 4th DCA 2004) (stating that an injured worker “cannot add together all of the small risks of injury created by [the employer’s] conduct ‘in order to reach a combined total where the likelihood of injury to some employee sometime was substantially certain’ ” (quoting Fleetwood, 833 So.2d at 869)).
In this case, an employee was injured while performing a repetitive, moderately dangerous job, a job which he had performed alone without injury for months. This same job had been performed by a number of other employees literally thousands of times over a thirty-four year period of time, all without incident. In this context, it cannot be said that the employer should have known that it was substantially certain that injury or death would follow from operation of this machine so as to circumvent the workers’ compensation laws.
I also cannot agree that reversal of the summary judgment entered below is mandated by the Florida Supreme Court’s statement in Turner that it was receding from its earlier decision in Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), “to the extent [that Lawton ] can be read as rejecting the facts as stated therein as a sufficient basis to support an allegation of substantial certainty of injury.” Turner, 754 So.2d at 691 n. 8.
With all due respect to the majority herein, the allegations referred to in Turner as being sufficient to support an allegation of substantial certainty of injury were not limited to the allegations, quoted here by the majority, that the employer in that case had been warned on numerous prior occasions that “for safety reasons, point of operation guards should be provided on the press and that operators should be instructed about the various dangers involved in operating the press.” Majority opinion at 296 (quoting Lawton, 498 So.2d at 880). Rather, as the dissent in Lawton confirms, the Lawton complaint alleged that in addition to ignoring the manufacturer’s numerous warnings to install point of operation guards, the employer had intentionally disabled all safety features of the punch press at issue and had affirmatively denied the injured worker the right to use any safety mechanisms:
Lawton’s third amended complaint set forth several other allegations that the majority of this Court has apparently overlooked. Lawton alleged that [his employer] affirmatively removed any and all ramblocks or other inside guards provided by the manufacturer and/or affirmatively denied Lawton the right to use other ramblocks and/or inside guards. The complaint also alleged that [the employer] intentionally exposed its workers to serious injury and/or death by intentionally refusing to follow the law and regulations concerning the safety of its workers, and such actions constituted an intentional and/or reckless intent to cause injury or death to its own workers.
Lawton, 498 So.2d at 881 (Adkins, J., dissenting).
Nothing remotely similar was alleged here. Casas alleges only that machine 409 had no point of operation guards. Nowhere does he allege or claim that Siemens refused to install recommended safety features that it disabled safety features, or that it refused to allow employees to use them.
*305 Moreover, unlike Lawton, in which a summary judgment was entered on bare pleadings, this case involves a summary judgment following substantial discovery. The unrebutted evidence adduced during discovery shows that machine 409 had point of operation guards. The unrebutted evidence also was that: (1) these Plexiglas point of operation guards were OSHA compliant, see 29 CFR § 1910.217(c)(2)(iii) (approving for use as point of operation guards a “fixed barrier guard”) and had been on machine 409 for at least ten years before Casas’ injury[8]; (2) Siemens’ policy was that no press was to be operated without its point of operation guards and that, if a supervisor saw one operating •without its guards, it was to be shut down immediately[9]; (3) Siemens, which had purchased the facility where Casas worked shortly before he was injured, had on its own initiative already hired experts, conducted a survey, and begun upgrading the point of operation guards for all of its presses, including machine 409, by the time of Casas’ injury; and, (4) on the day Casas was injured, the Plexiglas guards for machine 409 were found lying on the ground beneath the machine.
Thus, while the pleadings in Lawton may have been sufficient to state a claim that might avoid the immunity conferred by the workers’ compensation laws, the record before the court below in this case was inadequate to sustain a claim under that or any other precedent. Therefore, on reconsideration, I would still conclude that although Bakerman II necessarily eliminated one of our reasons for initially affirming summary judgment in favor of Siemens in this case, the remainder of our reasons supports the same outcome. Indeed, even assuming that Casas has adequately alleged facts sufficient to support an allegation of “substantial certainty of injury” under Lawton, those allegations are conclusively refuted by the record.
For these reasons, I would affirm the summary judgment entered below and therefore respectfully dissent.

. In fact, the record shows that no one had sustained a serious crushing injury in any of the twenty or so other presses operated at the plant where Casas worked for at least twenty years before Casas was injured. The only evidence of any press injury other than Casas' comes from a workers’ compensation report which states that in October 1999 an employee’s finger was lacerated by a brake press requiring "first aid” at a local hospital but no loss of work time.

. The uncontradicted evidence was that following Casas' injury, the guards were found on the ground at the base of the machine. Obviously, they had to exist.

. In 2003, the Florida Legislature codified this court-created intentional tort exception to the workers' compensation law, but in doing so, adopted a stricter "virtual-certainty standard,” thereby modifying the standard announced in Turner. See Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 784 n. 5 (Fla. 2004) (citing ch. 2003-412, § 14, at 3890-91, Laws of Fla.). Under this provision, which became effective October 1, 2003, an injured employee can satisfy the intentional tort exception and thereby avoid the exclusive remedy provisions of the workers' compensation law: "by proving by clear and convincing evidence that his employer 'deliberately intended to injure him’ or that his employer ‘engaged in conduct that the employer knew, based on prior similar accidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee, and the employee was not aware of the risk because the danger was not apparent and the employer deliberately concealed or misrepresented the danger so as to prevent the employee from exercising informed judgment about whether to perform the work.’” Id. (quoting § 440.11(1 )(b)(2), Fla. Stat. (2003)). Because the incident in this case occurred in 2000, the 2003 amendment, with its stricter standard, does not apply.

. Casas testified that his supervisor told him that it was unnecessary to turn the power off when removing a stuck metal lid from within machine 409 with the aid of a long tool. Because the tool, not the operator's hand, would be in the press, there is nothing "inadequate” about this.

. The uncontradicted evidence was that machine 409 was equipped with two one-half inch thick Plexiglas guards at its front and left sides and metal guards on the machine's right side where the metal feeder was located. There were no guards on the backside of the press, which could be accessed only by crawling under it.

. Both a supervisor at the plant where Casas worked and the employee who worked next to Casas (and who operated this press for ten years before he trained Casas to run it) testified that they had never seen machine 409 operate without the plastic guards in place.